CONTINENTAL AIRLINES,
INC., Petitioner

v.

Norma L. KIEFER and Robert
C. Kiefer, Respondents.

AMERICAN AIRLINES, INC. and Metro
Airlines, Inc., Petitioners

v.

Douglas O. SHUPE, Douglas A. Shupe
and Marsha L. Shupe,
Respondents.

Nos. 94–1143, 95–0500.

Supreme Court of Texas.

Argued Sept. 5, 1995.

Decided April 12, 1996.

ald E. Herrmann, Tomi Kay Mills, Fort Worth, for petitioner.

Laurance L. Priddy, Fort Worth, for respondents.

HECHT, Justice, delivered the opinion of the Court, in which PHILLIPS, C.J., and GONZALEZ, CORNYN, ENOCH, SPECTOR, OWEN and ABBOTT, JJ., join.

We granted the applications for writ of error in these two cases and consolidated them to consider to what extent state common-law personal-injury negligence actions against airlines are preempted by the federal Airline Deregulation Act of 1978 (ADA), which as recodified provides, with certain limitations unimportant here, that "a State ... may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier...." 49 U.S.C.A. § 41713(b)(1) (West Supp.1995).

In one case, Norma Kiefer claims to have been injured while riding on a Continental Airlines plane when she was struck in the back of the head by a briefcase that fell from an overhead storage bin a flight attendant had opened to retrieve an article for another passenger. Kiefer and her husband sued Continental for negligence, and later asserted other claims which we will discuss momentarily. Continental moved for summary judgment in part on the ground that the Kiefers' action was preempted by the ADA, and the district court granted the motion expressly on that basis. A divided court of appeals reversed and remanded the case for further proceedings. *Kiefer v. Continental Airlines, Inc.*, 882 S.W.2d 496 (Tex.App.—Houston [1st Dist.] 1994).

In the other case, Douglas Shupe claims that he was injured when American Airlines, Metro Airlines and Firelands Travel failed to provide an agent to meet his Metro American Eagle flight at Dallas–Fort Worth International Airport and assist him in transferring

Dee J. Kelly, Fort Worth, Debra S. Fitzgerald, Dallas, Kim M. Meaders, Dallas, Don-

to an American connecting flight. Shupe alleges that his parents had paid a $25 fee for this "meet-and-assist" service when they purchased his ticket, explaining to the travel agent that because of a sudden onset of mental illness Shupe was confused and unable to exercise the judgment necessary to care for himself. When no one met Shupe at the Airport, he contends he wandered away from the terminal into a parking lot where he found himself in an altercation with airport police that led to his arrest and jailing. Shupe and his parents sued American, Metro and Firelands Travel for negligence, breach of contract, and violations of the Texas Deceptive Trade Practices—Consumer Protection Act, TEX.BUS. & COM.CODE §§ 17.41–.63. American and Metro moved for summary judgment on the ground that the ADA preempted the Shupes' action, and the district court granted the motion. The court then severed out the Shupes' action against Firelands Travel, making the summary judgment for the airlines final. The court of appeals affirmed as to the DTPA claim but reversed as to the breach of contract and negligence claims and remanded them for further proceedings. *Shupe v. American Airlines, Inc.*, 893 S.W.2d 305 (Tex.App.—Fort Worth 1995). Only the airlines applied to this Court for writ of error, and they complain only of the court of appeals' reversal of the summary judgment on the negligence claim.

We hold that neither the Kiefers' nor the Shupes' claims are preempted and therefore affirm the judgments of the courts of appeals.

## I

A question about the finality of the summary judgment in *Kiefer* and the status of other claims the Kiefers assert necessitates a brief prelude to our consideration of the preemption issues.

As we have said, the Kiefers sued for negligence, and Continental moved for summary judgment based on preemption. Before the district court granted Continental's motion, the Kiefers amended their pleadings twice. The first amended petition has not been included in the appellate record, and thus we do not know what it contained. Nor can we ascertain whether it was filed timely—that is, at least seven days before the summary judgment hearing, *Goswami v. Metropolitan Sav. & Loan Ass'n*, 751 S.W.2d 487, 490 (Tex.1988) (applying TEX.R.CIV.P. 63)—although the Kiefers assert in their brief in this Court that it was. The Kiefers' response to Continental's motion for summary judgment referred to an amended pleading filed contemporaneously, which was ten days before the hearing, that asserted federal causes of action. We surmise this was the first amended petition, but we cannot be sure.

■ The Kiefers' second amended petition is in the record. It asserted two new causes of action: an implied cause of action under the ADA, and a federal common-law negligence action. The second amended petition was filed only five days before the summary judgment hearing and thus was untimely unless filed with leave of court. *Id.* However, leave of court is presumed when a summary judgment states that all pleadings were considered, and when, as here, the record does not indicate that an amended pleading was not considered, and the opposing party does not show surprise. *Id.* The *Kiefer* judgment's recital that the court, "after examining the pleadings", concluded that Continental was entitled to summary judgment satisfies the first condition. We thus presume that the Kiefers filed their second amended petition with leave of court.

■ Continental moved for summary judgment "on all claims brought by" the Kiefers, thus including the two federal claims even though they were first raised after the motion was filed. However, no ground stated in Continental's motion entitles it to summary judgment on the later-filed claims. Obviously, the ADA does not preempt federal claims, and Continental does not argue otherwise. If the district court held the Kiefers' federal claims to be preempted, it plainly erred; but if the court simply did not consider the federal claims, then the summary judgment was not final and appealable. "In order to be a final, appealable summary judgment, the order granting the motion must dispose of all parties and all issues

before the court." *Mafrige v. Ross,* 866 S.W.2d 590, 591 (Tex.1993).

The summary judgment states that "the cause of action is dismissed as being preempted". The reference to "cause of action", singular, suggests that summary judgment was not granted on all the Kiefers' causes of action, plural. However, the judgment is entitled, *"FINAL SUMMARY JUDGMENT "*. The district court did not overlook the Kiefers' federal causes of action. The Kiefers specifically pointed them out in their response to the motion for summary judgment and in a motion for new trial. Continental's reply to the motion for new trial did not argue that summary judgment was proper, but that no federal causes of action existed like those the Kiefers asserted. After hearing argument on the motion for new trial, the district court denied it by signed order.

■ Finality "must be resolved by a determination of the intention of the court as gathered from the language of the decree and the record as a whole, aided on occasion by the conduct of the parties." 5 RAY W. MCDONALD, TEXAS CIVIL PRACTICE § 27:4[a], at 7 (John S. Covell, ed., 1992 ed.); *see Ferguson v. Ferguson,* 338 S.W.2d 945, 947 (Tex.1960). In the circumstances described here, we think the district court intended to render a final, appealable judgment. The court's rejection of the Kiefers' arguments that the federal claims should be treated differently favors this conclusion. Neither the parties nor the court of appeals have suggested that the judgment was not final.

■ The Kiefers complained to the court of appeals that their federal claims should not have been dismissed. The appeals court did not address those complaints because it concluded from the prayer in the Kiefers' brief that those complaints were "only in the alternative" to their complaint as to their state common-law negligence claim. 882 S.W.2d at 505. We do not read the Kiefers' prayer for relief so narrowly. The Kiefers asked the court of appeals "that the Order of the trial court dismissing appellant's case . . . be in all things reversed and that this Court remand this case to the trial court for a full trial on the merits. . . ." The court of appeals was obliged to address the dismissal of the Kiefers' federal claims. However, the Kiefers have not complained to us of this error.

■ That still is not the end of the matter. The court's opinion states that summary judgment is reversed only on the state common-law negligence claim. Nevertheless, the judgment of the court of appeals orders "that the judgment of the court below be *in all things* reversed and the cause remanded for proceedings consistent with the opinion of this Court." (Emphasis added.) The judgment of the court of appeals thus conflicts with its opinion. As the mandate of the court must issue "in accordance with the judgment", TEX.R.APP.P. 86(a), we hold that the language of the judgment controls over the conflicting language of the opinion, and therefore that summary judgment was reversed as to all the Kiefers' claims. Continental does not complain of the reversal of summary judgment on the Kiefers' federal claims. Accordingly, we intimate no view as to their validity.

## II

To summarize, while plaintiffs in both consolidated cases asserted several causes of action against the airline defendants in the courts below, the only cause of action now before us in each case is common-law negligence. Although the factual allegations in each case are very different, the results below were the same: in each case the district court held that the action was preempted by the ADA and the court of appeals reversed. Hence, the question before us is whether the ADA preempts either of these negligence claims.

The preemption provision in the ADA as originally passed stated in pertinent part: "no State . . . shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or service of any air carrier. . . ." Airline Deregulation Act of 1978, Pub.L. No. 95–504, § 105(a)(1), 92 Stat. 1705, 1708 (1978) (formerly codified at 49 U.S.C.App. § 1305(a)(1) (1988)). We refer to this provision as section 1305(a)(1) because

that is the reference most commonly used by the cases discussing it. In 1994, the ADA and other statutes relating to transportation were recodified in Title 49 of the United States Code. Law of July 5, 1994, Pub.L. No. 103–272, sec. 1, 108 Stat. 745, 745 (1994). Congress stated that this recodification was "without substantive change", *id.,* and we read the statute before and after recodification to have the identical effect. We therefore cite to the current code whenever possible.

The slate on which we write is already extensively and authoritatively inscribed. The United States Supreme Court has considered the scope of the ADA's preemption in two opinions. While neither answers our question directly, both provide guidance we are obliged to follow. Thus, we begin our analysis with a detailed examination of those two cases.

In *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992), the Court held that the ADA "preempts the States from prohibiting allegedly deceptive airline fare advertisements through enforcement of their general consumer protection statutes." *Id.* at 378, 112 S.Ct. at 2034. Several state attorneys general, including Texas', had threatened to enforce advertising fairness guidelines against airlines by means of state consumer protection laws. The Supreme Court affirmed an injunction prohibiting such enforcement.

To arrive at this conclusion, the Court began with a brief review of the history leading to enactment of the ADA.

> Prior to 1978, the Federal Aviation Act of 1958 (FAA) ... gave the Civil Aeronautics Board (CAB) authority to regulate interstate air fares and to take administrative action against certain deceptive trade practices. It did not, however, expressly pre-empt state regulation, and contained a "saving clause" providing that "[n]othing ... in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." [Federal Aviation Act of 1958, Pub.L. No. 85–726, § 1106, 72 Stat. 731, 798 (1958) (formerly codified at 49 U.S.C.App. § 1506 (1988), now recodified at 49 U.S.C.A. § 40120(c) (West Supp. 1995): "A remedy under this part is in addition to any other remedies provided by law.").] . . . .
>
> In 1978, however, Congress, determining that "maximum reliance on competitive market forces" would best further "efficiency, innovation, and low prices" as well as "variety [and] quality ... of air transportation services," enacted the Airline Deregulation Act (ADA). [49 U.S.C.A. § 40101(a)(6), (a)(12)(A) (formerly codified at 49 U.S.C.App. §§ 1302(a)(4), (a)(9)).] To ensure that the States would not undo federal deregulation with regulation of their own, the ADA included a pre-emption provision, prohibiting the States from enforcing any law "relating to rates, routes, or services" of any air carrier. [49 U.S.C.A. § 41713(b)(1) (formerly codified at 49 U.S.C.App. § 1305(a)(1)).] The ADA retained the CAB's previous enforcement authority regarding deceptive trade practices (which was transferred to the Department of Transportation (DOT) when the CAB was abolished in 1985) and it also did not repeal or alter the saving clause in the prior law.

*Id.* at 378–379, 112 S.Ct. at 2034. The Court noted that the DOT, the federal agency retaining airline regulatory authority, opposed state enforcement of airfare advertising guidelines. *Id.* at 379, 112 S.Ct. at 2034–35.

The Court then turned to the language of the preemption provision. The phrase, "relating to", the Court said, means " 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with,' " and thus "express[ed] a broad pre-emptive purpose". *Id.* at 383, 112 S.Ct. at 2034. The Court compared the provision to "the similarly worded preemption provision of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1144(a)". *Id.* at 383, 112 S.Ct. at 2037. Noting that it had in several cases already characterized identical language in the ERISA provision as having a "broad scope" and "expansive sweep", and as being "broadly worded", "deliberately expansive", and "conspicuous for its breadth", the

Court concluded: "we think it appropriate to adopt the same standard here: State enforcement actions having a connection with or reference to airline 'rates, routes, or services' are pre-empted" by the ADA. *Id.* at 384, 112 S.Ct. at 2037.

The Court rejected the argument that the savings clause in the prior statute limited the breadth of the preemption provision. "A general 'remedies' saving clause cannot be allowed to supersede the specific substantive pre-emption provision...." *Id.* at 385, 112 S.Ct. at 2037. Underscoring the point, the Court added: " 'we do not believe Congress intended to undermine this carefully drawn statute through a general saving clause.' " *Id.* (quoting *International Paper Co. v. Ouellette,* 479 U.S. 481, 494, 107 S.Ct. 805, 812, 93 L.Ed.2d 883 (1987)).

The Court also rejected the arguments that the ADA "only preempts the States from actually prescribing rates, routes, or services", *id.,* and that "only state laws specifically addressed to the airline industry are pre-empted", *id.* at 386, 112 S.Ct. at 2038. Such "loopholes" would allow "state impairment of the federal scheme" and ignored the broad "relating to" language of the provision. *Id.* The Court cited *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), which held that the preemption provision in ERISA, similar to the ADA's, extended to common-law tort and contract actions, *id.* at 47–48, 107 S.Ct. at 1552–53.

■ Despite all this, ADA preemption is not boundless. Concerning state advertising restrictions on airfares, the Court allowed that " '[s]ome state actions may affect [airline fares] in too tenuous, remote, or peripheral a manner' to have a pre-emptive effect." *Morales,* 504 U.S. at 390, 112 S.Ct. at 2040. The Court gave as an example a state law prohibition against obscenity in advertising. The ADA does not preempt all enforcement of state law against airlines, the Court acknowledged, but since " '[t]he present litigation plainly does not present a borderline question, ... we express no views about where it would be appropriate to draw the line.' " *Id.* at 390, 112 S.Ct. at 2040.

The Supreme Court drew *a* line in *American Airlines, Inc. v. Wolens,* —— U.S. ——, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995). The Court held that the ADA did not preempt a breach of contract action by participants in an airline's frequent flyer program complaining of retroactive changes in terms and conditions of the program, but did preempt an action for violations of state consumer protection laws based on the same allegations. Unlike in *Morales,* the issue was not, according to the Court, whether the private lawsuits related to airline rates and service. "*Morales,* we are satisfied, does not countenance the ... separation of matters 'essential' from matters unessential to airline operations. Plaintiffs' claims relate to 'rates' ... and to 'services'...." *Id.* at ——, 115 S.Ct. at 823. Nor was the relationship so tenuous, as the *Morales* Court theorized one might be, as to escape the reach of the ADA preemption provision. The issue, instead, was whether the private actions constituted state enactment or enforcement of any law prohibited by the preemption provision. *Id.*

Suit on the Illinois consumer protection statute, the Court held, violated the prohibition because of "the potential for intrusive regulation of airline business practices inherent in state consumer protection legislation". *Id.* Such a state law

> serves as a means to guide and police the marketing practices of the airlines; the [state law] does not simply give effect to bargains offered by the airlines and accepted by airline customers. In light of the full text of the preemption clause, and of the ADA's purpose to leave largely to the airlines themselves, and not at all to States, the selection and design of marketing mechanisms appropriate to the furnishing of air transportation services, we conclude that § 1305(a)(1) preempts plaintiffs' claims under [state statute].

*Id.* at —— – ——, 115 S.Ct. at 823–824 (footnote omitted). The Court also noted that the DOT retained authority to investigate and prohibit unfair and deceptive practices. *Id.* at —— n. 4, 115 S.Ct. at 823 n. 4.

On the other hand, the Court reasoned, a suit for breach of contract does not involve

the same potential for intrusive state regulation.

> We do not read the ADA's preemption clause, however, to shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings. As persuasively argued by the United States, terms and conditions airlines offer and passengers accept are privately ordered obligations "and thus do not amount to a State's 'enact[ment] or enforce[ment] [of] any law, rule, regulation, standard, or other provision having the force and effect of law' within the meaning of [§] 1305(a)(1)."

*Id.* at ———, 115 S.Ct. at 824 (footnote omitted). Still, the call was close.

> The United States recognizes that § 1305(a)(1), because it contains the word "enforce" as well as "enact," "could perhaps be read to preempt even state-court enforcement of private contracts." But the word series "law, rule, regulation, standard, or other provision," as the United States suggests, "connotes official, government-imposed policies, not the terms of a private contract." Similarly, the phrase "having the force and effect of law" is most naturally read to "refe[r] to binding standards of conduct that operate irrespective of any private agreement." Finally, the ban on enacting or enforcing any law "relating to rates, routes, or services" is most sensibly read, in light of the ADA's overarching deregulatory purpose, to mean "States may not seek to impose their own public policies or theories of competition or regulation on the operations of an air carrier."

*Id.* at ——— n. 5, 115 S.Ct. at 824 n. 5 (citations omitted). Putting an even finer point on it, the DOT argued that " '[s]ome state-law principles of contract law ... might well be preempted to the extent they seek to effectuate the State's public policies, rather than the intent of the parties.' " *Id.* at ——— n. 8, 115 S.Ct. at 826 n. 8. The Court rejected this argument, but only because it believed that "contract law is not at its core 'diverse, nonuniform, and confusing' " so as

to threaten a "large risk of nonuniform adjudication" of contract claims. *Id.*

One factor contributing to the Court's reluctance to construe the ADA to preempt simple contract claims was the lack of any vehicle for resolving such disputes other than state court lawsuits. Although the DOT can and does prohibit unfair and deceptive practices, the Court agreed with the United States "that the DOT has neither the authority nor the apparatus required to superintend a contract dispute resolution regime." *Id.* at ———, 115 S.Ct. at 825. In dismantling federal regulation of airlines, the Court observed, Congress "indicated no intention to establish, simultaneously, a new administrative process for DOT adjudication of private contract disputes." *Id.*

> Nor is it plausible that Congress meant to channel into federal courts the business of resolving, pursuant to judicially fashioned federal common law, the range of contract claims relating to airline rates, routes, or services. The ADA contains no hint of such a role for the federal courts. In this regard, the ADA contrasts markedly with the ERISA, which does channel civil actions into federal courts ... under a comprehensive scheme, detailed in the legislation, designed to promote "prompt and fair claims settlement."

*Id.* at ——— – ———, 115 S.Ct. at 825–826.

The Court also observed that its construction of the ADA preemption provision

> makes sense of Congress' retention of the FAA's savings clause.... The ADA's preemption clause, § 1305(a)(1), read together with the FAA's saving clause, stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated. This distinction between what the State dictates and what the airline itself undertakes confines courts, in breach of contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement.

*Id.* at ———, 115 S.Ct. at 826 (footnote omitted).

This very strict limitation on permissible contract claims demonstrates the breadth of ADA preemption. As in *Morales,* however, the Court hinted that other claims might not be preempted. Although *Wolens* did not involve tort claims, the Court made three observations in a footnote. First, the FAA "requires an air carrier to have insurance, in an amount prescribed by the DOT, to cover claims for personal injuries and property losses 'resulting from the operation or maintenance of aircraft.'" *Id.* at —— n. 7, 115 S.Ct. at 825 n. 7; *see* 49 U.S.C.A. § 41112(a) (West Supp.1995) (formerly codified at 49 U.S.C.App. § 1371(q)(1) (1988)). Second, American Airlines, the petitioner in *Wolens,* did not "urge that the ADA preempts personal injury claims relating to airline operations." *Id.* To the contrary, counsel for American acknowledged at oral argument that "'safety claims,' for example, a negligence claim arising out of a plane crash, 'would generally not be preempted'". *Id.* Third, the DOT had expressed a similar—but noticeably different and perhaps broader— view, stating in its brief: "'It is ... unlikely that Section 1305(a)(1) preempts safety-related personal-injury claims relating to airline operations.'" *Id.* While the Court drew no conclusions from these facts, they do not appear to be consistent with a view that the ADA preempts all tort claims.

## III

Mindful of *Wolens'* admonition that "in our system of adjudication, principles seldom can be settled 'on the basis of one or two cases, but require a closer working out'", *id.* at ——, 115 S.Ct. at 827 (citing Roscoe Pound, *Survey of the Conference Problems,* 14 U.Cin.L.Rev. 324, 339 (1940) (Conference on the Status of the Rule of Judicial Precedent)), we turn to the "closer working out" the cases before us require.

■ We begin with the question whether a personal-injury negligence action, like the Kiefers' and the Shupes', is "related to" an airline's prices or services within the meaning of Section 41713(b)(1). We think the answer is rather clearly yes, given the broad definition of "related to" prescribed by *Morales* and the Supreme Court's comparison of

its expansiveness to ERISA preemption. Such a negligence action is not related to airline rates and services quite as directly as the contract claims in *Wolens,* but the impact of tort liability on an airline's rates and services is no less real. The effect is certainly not as "tenuous, remote, or peripheral" as a prohibition against obscenity in advertising, the example *Morales* gives of a non-preempted law. 504 U.S. at 390, 112 S.Ct. at 2040. Tort liability cannot but have, in *Morales'* words, "a significant impact upon the fares [airlines] charge", *id.* at 390, 112 S.Ct. at 2040, just as the advertising guidelines in that case. Although two Justices in *Wolens* indicated agreement with earlier circuit decisions that particular tort claims did not relate to airline services, —— U.S. —— – ——, 115 S.Ct. at 830–831 (O'Connor, J., joined by Thomas, J., concurring in the judgment in part and dissenting in part), a majority of the Court did not share that view, and we do not see how it survives *Wolens.*

The next question is whether personal-injury negligence actions like those before us constitute enforcement of state law within the meaning of Section 41713(b)(1). The answer does not depend on whether the litigants are private citizens. *Wolens* squarely rejects the idea that a suit brought by private parties is not enforcement of state law. The answer to the question depends upon several considerations expressed in *Wolens,* not all of which point to the same answer. The DOT is no more suited to try common-law negligence actions than it is to enforce private contracts. Nor is it any more "plausible that Congress meant to channel into federal courts the business of resolving, pursuant to judicially fashioned federal common law," —— U.S. at ——, 115 S.Ct. at 825, negligence claims relating to airline rates and services than it is contract claims. These factors weigh against preemption in the present cases, but they were not *Wolens'* central concerns.

■ *Wolens* draws a fundamental distinction between "what the State dictates and what the airline itself undertakes". *Id.* at ——, 115 S.Ct. at 826. The former is preempted by the ADA; the latter is not. The critical determination in applying this

distinction is not *whether* the State dictates, but *what* it dictates. Through legal proceedings, the State requires compliance with consumer protection laws as well as the exercise of ordinary care in prescribed circumstances, but it also requires performance of contracts. While contractual obligations are voluntarily undertaken, the duty to perform them, once undertaken, is no longer voluntary. As *Wolens* recognizes, suits on private contracts involve some enforcement of state law—the law of contracts. *Id.* at —— n. 5, 115 S.Ct. at 824 n. 5. *Wolens'* emphasis on the voluntariness of contractual undertakings is important, not because states have no role in enforcing contracts—they do—but because contract law does not effectuate purposes that could have a prohibited regulatory effect on airlines. If contract law were less uniform among the states, varying according to differing States' interests, it might, as the DOT argued in *Wolens*, "effectuate the State's public policies, rather than the intent of the parties", *id.* at —— n. 8, 115 S.Ct. at 826 n. 8, and thus be preempted. It cannot be said that enforcement of contracts involves none of "what the State dictates", but only that contract enforcement involves so little state policy that it cannot be considered regulation of airlines preempted by the ADA.

The duty to exercise ordinary care is different. Unlike a contractual obligation, it is imposed by law, not voluntarily assumed. Enforcement of the duty through a common-law negligence action does not merely give effect to "privately ordered obligations", *id.* at ——, 115 S.Ct. at 824, as a breach of contract suit does. On the other hand, like contract actions, a negligence action does not carry the same "potential for intrusive regulation of airline business practices inherent in state consumer protection legislation". *Id.* at ——, 115 S.Ct. at 823. Simple negligence law is not as uniform as contract law, but it is far more policy-neutral than specific-purpose legislation, like consumer protection laws. If states "impose their own public policies ... on the operations of an air carrier", *id.* at —— n. 5, 115 S.Ct. at 824 n. 5, by allowing enforcement of consumer protection laws but not by allowing suits for breach of the carrier's contracts, allowing negligence actions falls somewhere in between.

With certain reservations, we think negligence law is not so policy-laden in imposing liability for personal injuries that suits for damages like those before us are preempted by the ADA. We recognize that with negligence law, and other tort law, there is a greater risk that state policies will be too much involved than there is with contract law, especially in the area of damages. For example, recovery of punitive damages for negligence is, depending on the State involved, essentially unlimited, limited by judicial rule, limited by statute, shared between the plaintiff and the state, or disallowed altogether. One could easily argue that the threat of punitive damages against airlines has a greater regulatory effect than liability for actual damages. Also, recovery of damages for mental anguish may or may not require accompanying physical injury, or aggravated conduct by the defendant, or be subject to other restrictions. Such differences could fall within the concerns argued by the DOT in *Wolens*, but these differences are minimal in the cases before us. Plaintiffs in neither case seek punitive damages, and we cannot determine from the limited summary judgment records how significant the mental anguish claims may be. Of course, plaintiffs may amend their pleadings before trial to claim punitive damages, but we decline to speculate whether such claims would, in these cases or other situations, be preempted by the ADA.

Fundamentally, the purpose of ADA preemption is not to absolve airlines from all liability under state law, but to prohibit state regulation of air carriers, direct or indirect. Congress' concern was "that the States would not undo federal deregulation with regulation of their own". *Morales*, 504 U.S. at 378, 112 S.Ct. at 2034. Common-law negligence actions to recover damages for personal injuries do not impinge in any significant way on Congress' concern. Such actions did not impair federal regulation before the ADA, and we do not see how they impair deregulation since.

Other tort actions might, and as we have said, so might recovery in negligence actions for punitive damages or even mental anguish

damages. An action for negligent misrepresentation might be argued to be indistinguishable from the statutory consumer protection actions in *Morales* and *Wolens*. Strict products liability could be argued to embody State policies to a degree prohibited by ADA deregulation policy. These are but two examples. We need not address these issues here but leave them for "a closer working out" in future cases. We hold only that the ADA does not preempt common-law personal-injury negligence claims against air carriers, subject to the reservations we have expressed as to damages.

## IV

Our reasoning does not track that of the only other court since *Wolens* to address issues essentially the same as the ones before us. Before we conclude, we explain why.

As we have noted, *Wolens* contains three observations concerning airlines' non-preempted tort liability. First, the FAA requires airlines to carry insurance covering personal injury and property damages resulting from the "operation or maintenance" of aircraft. Next, American Airlines did not argue in that case that the ADA preempts personal-injury claims relating to "airline operations" but conceded that "safety claims", such as those arising from a plane crash, would generally not be preempted. Finally, the DOT's position was that preemption of safety-related personal-injury claims relating to "airline operations" was unlikely. —— U.S. at —— n. 7, 115 S.Ct. at 825 n. 7. One might naturally surmise from these observations that the Supreme Court believed that the ADA does not preempt all tort actions against airlines, although the Court itself did not intimate what conclusions should be drawn.

These comments in *Wolens* have been the focus of two en banc Fifth Circuit decisions. In *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334 (5th Cir.1995) (en banc), the court faced facts almost identical to the facts in the case before us against Continental. Hodges was injured when a case of rum fell from an overhead bin opened by a fellow passenger, cutting her arm and wrist. The court concluded that the ADA does not preempt

claims relating to aircraft operation and maintenance because otherwise the statutory requirement of insurance would be pointless. Thus, even though Hodges' negligence suit against Delta could be said to relate to airline services, it was not preempted because it related to operation of the aircraft. *Id.* at 336–339. In *Smith v. America West Airlines, Inc.*, 44 F.3d 344 (5th Cir.1995) (en banc), decided the same day as *Hodges*, a group of passengers sued America West Airlines for failing to ensure their safety by allowing a hijacker to board their plane. The court concluded that the claim related to airline services and not to aircraft operations, but nevertheless held that it was not preempted because allowing the action would not constitute an economic regulation of the airline. *Id.* at 346–347.

The Fifth Circuit's distinction between airline services and aircraft operations is problematic for three reasons. First, it is not supported by *Morales* or *Wolens*. We do not read those cases to suggest that a tort claim related to airline services is not preempted if it is related to aircraft operations or maintenance. *Morales'* construction of "relating to rates, routes or services" could scarcely be broader. We do not think the Court would have failed to mention an exception to this construction large enough to encompass claims relating to aircraft operations and maintenance. Such claims may not be preempted under *Morales* or *Wolens*, but not simply because of their connection with operations and maintenance. Rather, as *Wolens* explains at some length, claims are not preempted if they do not involve the enforcement of policy-laden state law that too closely approaches a regulatory effect on airlines. A service-operations distinction is an unnecessary overlay on *Wolens'* analysis.

Second, a distinction between airline services and aircraft operations and maintenance is difficult to draw, as *Hodges* illustrates. The majority of the court had no difficulty viewing Hodges' claim as related to operations rather than services, while two dissenting judges concluded that the opposite view was equally plain. *Hodges,* 44 F.3d at 343–344 (Higginbotham, J., joined by Garza, J., dissenting). As the concurring opinion in

*Hodges* observed, the divergent perspectives of the majority and dissent "promise[ ] uncertainty and inconsistent results." *Id.* at 340 (Jolly, J., specially concurring).

Third, such distinction, to the extent it can be drawn, leads to anomalous results. For example, a damage claim by an airplane passenger hit by an article falling from an overhead bin would be preempted if the flight attendant dropped the article but not if the bin came open because of a latch that had not been properly maintained, or because the plane was jolted by turbulent weather. An airplane passenger who fell in an aisle would be prohibited from suing if the accident occurred when the passenger slipped on food dropped by a flight attendant, but not if the accident was caused by a sudden banking of the plane. There is nothing in the history of the ADA reviewed in *Morales* and *Wolens* to suggest that Congress intended such a hodgepodge of results.

*Hodges* and *Smith* attempt to overcome the problems with the service-operations distinction with yet another distinction, this one between economics and safety. According to those cases, claims related to the economic aspects of a service are preempted whereas those related to the safety aspects of a service are not preempted. *Hodges,* 44 F.3d at 339; *Smith,* 44 F.3d at 347. But this distinction only complicates matters further. *Smith* holds that the decision to allow a passenger to board is part of the service offered by an airline, but an action complaining of the decision is not preempted if the decision was related to safety rather than fares or booking or other economic concerns. In this view, a suit for allowing a deranged man to board a plane does not affect economic decisions concerning boarding, but only decisions about ticket sales, training and security—somehow not economic decisions. *Smith,* 44 F.3d at 347. We think this strains too far. It is hard to imagine a service provided by airlines that does not have both an economic and a safety component. This is certainly true of luggage storage in overhead compartments.

In sum, while we agree with the result in *Hodges,* we would reach it another way. The result in *Smith* is more doubtful, but reveals more of the complications of the analysis in both cases.

## V

The Kiefers' claim is for simple negligence and thus is not preempted, for the reasons we have explained, subject to damages issues we do not address. The Shupes' claim is more difficult, arising as it does from the airlines' failure to perform their agreement to provide meet-and-assist services. It appears from the record before us that the Shupes do not complain of any duty of care owed by the airlines apart from this agreement. Consequently, the Shupes may be limited to their action for breach of contract. *Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493 (Tex.1991). American and Metro have not raised this argument but may do so on remand. We cannot hold, however, that all negligence claims arising out of the performance of meet-and-assist services are preempted. We see no difference, for example, between a claim of injury caused by an article falling from an overhead compartment and a claim of injury caused by an airline agent's mishandling of a wheelchair in meeting and assisting a passenger. Neither claim is an enforcement of state law prohibited by *Wolens.* While the Shupes' negligence action may be precluded by *DeLanney,* it is not preempted by the ADA.

\* \* \* \* \* \*

Accordingly, the judgments of the courts of appeals are

Affirmed.

BAKER, J., concurs in judgment only.