# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

=====

### NO. 03-02-00743-CV

=====

**Arthur J. Hopkins, Appellant**

**v.**

**Texas Commission on Environmental Quality, Appellee**

=====
### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
### NO. 97-06616, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING
=====

### M E M O R A N D U M   O P I N I O N

This is an appeal from the granting of judgment *non obstante veredicto* (JNOV) after a jury award to a plaintiff in a whistleblower case. *See* Tex. Gov't Code Ann. §§ 554.001-.010 (West 2004). Arthur J. Hopkins sued his former employer, the Texas Commission on Environmental Quality,[1] alleging that he was terminated from his position as a geologist in retaliation for reporting the misconduct of fellow employee Steve White. The case was tried to a jury, which found in favor of Hopkins and awarded damages of $704,000 and attorney's fees of $80,000. The district court, however, granted JNOV and entered a take-nothing judgment. Because Hopkins presented no

---

[1] Texas Commission on Environmental Quality was formerly known as the Texas Natural Resource Conservation Commission. *See* 30 Tex. Admin. Code § 3.2(8) (West 2005) (changing name as of September 1, 2002).

evidence of a good faith report of a violation of law to an appropriate law enforcement authority, we affirm the district court's judgment.

## FACTUAL BACKGROUND

Arthur Hopkins is a geologist who was employed by the Commission for more than sixteen years. Hopkins was assigned to the surface casing unit, which reviews applications to drill or reenter oil or gas wells. Hopkins would review geologic information from the designated area and would issue a recommendation, in letter form, stating the location of usable-quality groundwater and the required measures for its protection.

The surface casing unit was responsible for issuing recommendations for wells across the entire state. The unit was divided into four geographic sectors. Hopkins was assigned to south Texas, White to east Texas, John Estep to north Texas, and Jack Oswald to west and central Texas. Each geologist was also assigned to work as "back up" for one of the other areas. From time to time, it was necessary for the geologists to handle issues and recommendations involving all areas of the state. Each geologist was responsible for issuing between four and five thousand recommendations a year.

As early as 1994, Hopkins began to complain to superiors about the quality of his co-worker White's recommendations. Specifically, Hopkins noticed that White was not researching the location of water in making recommendations and was simply relying on the computer to automatically generate a response. He also found numerous errors in White's work that were not related to reliance on the computer. At trial, Hopkins discussed examples of White's various errors and testified that White's erroneous recommendations numbered at least in the hundreds. He

2

emphasized that these erroneous recommendations created a risk for polluting drinking water in the state. Other geologists in the unit confirmed the poor quality of White's work.

Hopkins initially reported the problem to his immediate supervisor, Phil Carter, and to the other geologists in the surface casing unit. He also reported the problem to his friend Steve Wiley, who was a supervisor in the water well drillers section. In March 1995, Hopkins reported White's erroneous recommendations to Carter's supervisor, Mary Ambrose. Carter also relayed the problem to Steve Musik, manager of ground water assessment. In response, Hopkins was asked to monitor White's work. Hopkins testified that he reported fifty or sixty erroneous recommendations by White between March and September 1995. White was then placed on a performance improvement plan in an attempt to address the problem.

Hopkins also alleged that White had a history of harassing women at the Commission. Hopkins testified that White confided in him about his broken relationship with co-worker Irene Ritter and that Ritter complained to Hopkins about White's behavior. In early summer 1995, Hopkins secretly tape-recorded a conversation in which White discussed, in explicit detail, his sexual relationship with Ritter.[2] Within days of making the tape, Hopkins mentioned it to his friend Wiley, who was Ritter's supervisor. Hopkins testified that he witnessed White following Ritter around the office and recalled a conversation he had with Ritter and co-worker Mae Medearis in which Ritter expressed her frustration that White "won't leave me alone." Medearis testified about the incident in greater detail. She recounted that she was at her desk when Ritter rushed in "aggravated and

_____

[2] There is some dispute as to the circumstances of the recording. Hopkins testified that the tape was made while walking from the office to the parking lot. An internal Commission investigation concluded that the conversation took place either in Hopkins's or White's cubicle.

agitated" and exclaimed that White had been following her and was nearby. Medearis confirmed that Hopkins also came by the door and overheard Ritter soon after the incident. Hopkins later reported White's harassment of Ritter to Carter, who was the head of the surface casing unit. Hopkins also told his friend Wiley.

Hopkins presented evidence at trial that White sexually harassed other women at the office. Jan Giessregan testified that she worked closely with the surface casing unit as a private consultant. She stated that White would stare at her, make comments about her breasts, and even called her office a couple of times to ask her out. Giessregan reported White's improper behavior to Hopkins, but did not complain to anyone else for fear that White would retaliate by delaying her clients' applications. Giessregan testified that her secretary suffered similar mistreatment from White.

In January 1996, White made his own complaint against Hopkins. White sent documents that he obtained from Hopkins's cubicle to the Travis County District Attorney's office and alleged that Hopkins was using state property to publish a newsletter on roller pigeons.[3] Hopkins testified that this was around the time that he and Carter met with White to discuss his poor performance. When he was confronted about errors in his recommendations, White responded, "I have an ace up my sleeve." Following White's complaint against Hopkins, a Commission investigator witnessed Hopkins using his State computer for personal purposes. Hopkins received a written reprimand dated March 13, 1996, noting the investigator's observations of Hopkins's personal use of his computer and Hopkins's admission of personal use on one occasion. On March 20, Hopkins was placed on

---

[3] The roller pigeon is a breed of pigeon known for its ability to perform backward somersaults in mid-flight. Roller pigeons are widely bred by hobbyists for competition.

disciplinary probation for one year and suspended without pay for two weeks. The memorandum documenting the probation and suspension listed a number of specific occasions in 1994 and 1995 when Hopkins had used state computers and printers to generate personal correspondence and his newsletter. At trial, Hopkins denied ever having used Commission equipment to publish his newsletter.

While Hopkins served his two-week suspension, White was responsible for the recommendations in Hopkins's assigned area. Hopkins determined that approximately one fourth of the recommendations made by White in his absence were inaccurate. Hopkins again complained to his supervisor Carter.

White continued to make comments about Ritter to Hopkins. Hopkins again mentioned to Wiley the secret tape of White relating details of his sexual relationship with Ritter, intimating that it was bad. Wiley testified that he decided to tell Ritter about the tape and suggested that she listen to it. He told her that if she was offended, they could bring the matter up with the personnel office. Ritter testified that she also learned of the tape from two other Commission employees. Ritter testified that Hopkins eventually played the tape for her in a Commission conference room. Hopkins told her that she could use the tape in a sexual harassment complaint against White. Ritter stated that, after she listened to part of the tape, Hopkins turned it off and explained that there was more. Ritter told Hopkins that she didn't want to hear any more and that she wanted the tape. Ritter then left the room without taking the tape. She testified that it was extremely stressful and sickening to go back to work knowing that her co-workers were aware of the contents of the tape. Hopkins confirmed this

5

meeting but testified that he left the room while the tape was still playing and that Ritter did not ask to keep it.

After Ritter reported listening to the tape, the Commission conducted an investigation. Hopkins could not locate the tape during the internal Commission investigation, and it was not produced at trial. Throughout the disciplinary investigation, Hopkins complained to investigators and his superiors about the quality of White's work and about his sexual harassment of Ritter. As a result of the investigation, the Commission disciplined those employees who knew about the tape but failed to report it to the human resources division as required by the agency's sexual harassment policy. Hopkins was terminated for his misconduct in making the tape and playing it to Ritter.

Hopkins brought suit under the whistleblower act alleging that he was terminated in retaliation for reporting White's professional and personal misconduct. The case was tried before a jury. The district court granted a directed verdict as to retaliation for reporting White's sexual harassment and submitted the rest of Hopkins's whistleblower claim to the jury. The jury determined that the Commission retaliated against Hopkins for reporting what he in good faith believed to be a violation of law to an appropriate law enforcement authority. The jury found that Hopkins had suffered a loss of earning capacity in the past in the amount of $154,000 and in the future in the amount of $250,000, as well as mental anguish in the past in the amount of $300,000. Finally, the jury found that a reasonable and necessary fee for Hopkins's attorney was $80,000. In total, Hopkins was awarded $784,000. The district court granted the Commission's first motion for JNOV in part, reducing the award to $240,000 in light of the statutory cap on damages. Later, the district court

6

granted a second motion for JNOV and signed a take-nothing judgment. Hopkins appeals and asks us to render judgment in his favor.

## DISCUSSION

**Final Judgment**

Hopkins first contends that the district court's February 22, 2002 order granting in part and denying in part the Commission's first motion for JNOV constituted a final order in the case. As such, Hopkins argues that the district court lacked jurisdiction to enter a take-nothing judgment six months later. The supreme court has discussed the requirements for a final judgment following a trial on the merits. *See Moritz v. Preiss*, 121 S.W.3d 715, 718-19 (Tex. 2003); *Lehmann v. Har-Con*, 39 S.W.3d 191, 198-99 (Tex. 2001). "When a judgment, not intrinsically interlocutory in character, is rendered and entered in a case regularly set for a conventional trial on the merits," it will be presumed final for purposes of appeal. *Moritz*, 121 S.W.3d at 718-19; *see Lehman*, 39 S.W.3d at 199. If a judgment disposes of all issues in the case, it is not interlocutory. *See Moritz*, 121 S.W.3d at 719. Here, the order on the Commission's motion for JNOV does not purport to be a final judgment but does deny all of the Commission's objections to the jury's verdict raised in the JNOV. However, the district court's order does not contain an award of damages, interest, costs, or attorney's fees. Nor does the order make reference to any document listing these awards. Thus, the order was interlocutory in nature and the presumption of finality does not apply. *See Moritz*, 121 S.W.3d at 718-19. Furthermore, the supreme court has stated that the determination of finality is a broad inquiry:

Finality must be "resolved by a determination of the intention of the court as gathered from the language of the decree and the record as a whole, aided on occasion by the conduct of the parties."

*Id*. at 203 (quoting *Park Place Hosp. v. Estate of Milo*, 920 S.W.2d 274, 277 (Tex. 1996)). The language of the order leaves no impression that the court intended the order to be anything but a ruling on the Commission's motion for JNOV. The court clearly stated this intent on the record:

Well, Mr. Hopkins, you haven't gotten me a form of judgment that I can sign, and now here's Mr. Thompson back with a stronger motion than he had last time. What do you have to say about that?

In light of the specific language in the order granting in part and denying in part the Commission's motion for JNOV and the record's clear reflection of the court's contrary intent, we hold that the district court's order dated February 22, 2002, was not a final judgment. *See id*. We overrule Hopkins's first issue.

**Directed Verdict**

In issues eight through eleven, Hopkins raises four complaints regarding the district court's grant of directed verdict on his claim that he was retaliated against for reporting White's sexual harassment. Hopkins does not argue the merits of these issues in any of the pleadings before this court. He merely includes them in the issues presented and recites them again in the body of his opening brief:

Issue 8      Where a public employee reports multiple violations of law, some of which implicate the provisions of the Human Rights Act and others of which do not, the employee suffers retaliation for having made such

8

reports, and prior to filing suit he does not comply with the prerequisites of the Human Rights Act, is the employee precluded from seeking relief under the Whistleblower Act?

Issue 9   Where a public employee reports multiple violations of the law to a single law enforcement authority, the law enforcement authority to which the employee made the reports is an appropriate law enforcement authority as to some reports and not others, and the employee does not make separate reports to additional appropriate law enforcement authorities, does the employee lose the protections of the Whistleblower Act as to the additional reports made to the single law enforcement authority on the ground that such authority is not an appropriate law enforcement authority to receive such reports or, does the employee, having triggered the protections of the Whistleblower Act, become entitled to its protections as [to] each of his reports?

Issue 10  Did the trial court err when it granted directed verdict for the commission as to Hopkins' whistleblower reports pertaining to the harassment, sexual harassment, stalking or official oppression of Irene Ritter, Janet [Odie], and Barbara Simmons?

Issue 11  Did the trial court err when it instructed the jury not to consider Hopkins' whistleblower reports pertaining to harassment, sexual harassment, stalking or official oppression of Irene Ritter, Janet [Odie], and Barbara Simmons when answering Question One of the Court's Charge?

In order to maintain a point on appeal, an appellant must provide a discussion of the facts and authorities relied upon. *Heard v. Moore*, 101 S.W.3d 726, 730 (Tex. App.—Texarkana 2003, pet. denied) (citing *Ramsey v. Reagan*, No. 03-01-582-CV, 2003 Tex. App. LEXIS 276 (Tex. App.—Austin February 28, 2003, no pet.)); *see also* Tex. R. App. P. 38.1(h). A failure to discuss relevant facts and authority results in a waiver of the point on appeal. *Dallas Cent. Appraisal Dist. v. Tech Data*, 930 S.W.2d 119, 121 (Tex. App.—Dallas 1996, writ denied); s*ee also Horton v. Horton*, 965 S.W.2d 78, 88 (Tex. App.—Fort Worth 1998, no pet.) ("By raising an issue and failing

9

to present any argument or authority on that issue, the party waives that issue."). Because Hopkins has inadequately briefed his issues eight through eleven, we hold that he has waived those issues.

**JNOV on Whistleblower Claim**

In issues two through seven, Hopkins challenges the district court's grant of the Commission's second motion for JNOV and the resulting take-nothing judgment. Specifically, Hopkins contends that there was legally sufficient evidence to uphold the jury's verdict. A trial court may grant a JNOV if there is no evidence to support one or more of a jury's findings on issues necessary to liability. *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003). In reviewing the trial court's JNOV, we credit all favorable evidence that reasonable jurors could believe and disregard all contrary evidence except that which the jury could not ignore. *City of Keller v. Wilson*, 48 Tex. Sup. J. 848, 2005 Tex. LEXIS 436, at *74 (Tex. June 10, 2005); *see also Ancira Enters., Inc. v. Fisher*, No. 03-03-498-CV, 2005 Tex. App. LEXIS 4708, at *7 (Tex. App.—Austin, June 16, 2005, no pet. h.).

To establish his claim under the whistleblower act, Hopkins must demonstrate that he was terminated by the Commission in retaliation for making a good faith report of a violation of law by a public employee, White, to an appropriate law enforcement authority. *See* Tex. Gov't Code Ann. § 554.002(a); *Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 317 (Tex. 2002). The Commission argues first that Hopkins did not present evidence of a good faith report of a violation of law. In the alternative, the Commission contends that the report was not made to an appropriate law enforcement authority. A good faith report of a violation of law means that "(1) the employee believed that the conduct reported was a violation of the law, and (2) the employee's belief was

10

reasonable in light of the employee's training and experience." *Needham*, 82 S.W.3d at 320 (quoting *Wichita County v. Hart*, 917 S.W.2d 779, 784 (Tex. 1996)). A report is made to an appropriate law enforcement authority if the authority is part of a state or local government entity that the employee in good faith believes is authorized to (1) regulate under or enforce the law alleged to be violated or (2) investigate or prosecute a violation of criminal law. Tex. Gov't Code Ann. § 554.002(b); *see Duvall v. Tex. Dep't of Human Servs.*, 82 S.W.3d 474, 479 (Tex. App.—Austin, 2002, no pet.). An employee has a good faith belief that a report is made to an appropriate law enforcement authority if:

> (1) the employee believed the government entity was authorized to (a) regulate under or enforce the law alleged to be violated, or (b) investigate or prosecute a violation of criminal law; and

> (2) the employee's belief was reasonable in light of the employee's training and experience.

*Needham*, 82 S.W.3d at 321. The authority to take remedial or disciplinary action with regard to an employee's misconduct does not make an agency an appropriate law enforcement authority under the statute. *See id*.; *Duvall*, 82 S.W.3d at 481-82.

We will first examine whether Hopkins's report of White's erroneous recommendations constitutes a good faith report of a violation of law. Hopkins must show either (1) that he reported a violation of the law or (2) that he believed that White's conduct was a violation of the law and that belief was reasonable in light of Hopkins's training and experience. *See Needham*, 82 S.W.3d at 320.

11

Hopkins contends that he reported several actual violations of the law committed by White. He relies primarily on former section 26.2121 of the water code. *See* Act of September 1, 1991, 72d Leg., 1st C.S., ch. 3, § 8.22(b), 1991 Tex. Gen. Laws 91, 92, *repealed by* Act of September 1, 1997, 75th Leg., R.S., ch. 1072, § 60, 1997 Tex. Gen. Laws 4142 (former water code section 26.2121).[4] This provision of the water code established criminal penalties for intentional or knowing discharges of pollutants or for intentionally or knowingly making false statements on certain documents. *See id*. § 26.2121(a), (g), (m). First, we note that there was no evidence in the record that any of White's erroneous recommendations actually resulted in the discharge of pollutants. Therefore, White did not subject himself to criminal or administrative sanctions for causing the discharge of pollutants. *See id*. § 26.2121(a), (g).

Our determination of whether White's erroneous recommendations amounted to prohibited false statements requires an examination of the language of the statute. Subsection (m) states:

> A person commits an offense if the person intentionally or knowingly makes or causes to be made a false material statement, representation, or certification in, or omits or causes to be omitted material information from, an application, notice record, report, plan, or other document, including monitoring device data, filed or required to be maintained by this chapter, or by a rule, permit, or order of the appropriate regulatory agency.

*Id*. § 26.2121(m). Even if the information contained in White's recommendations was false, the recommendations must have been "required to be maintained" or "filed" with the Commission to

---

[4] For convenience, we will cite to the former water code provision.

be covered under this section of the statute. *See id*. All of the documents specifically mentioned by subsection (m) refer to materials provided *to* the Commission, not documents generated *by* the Commission. Hopkins focuses on the statute's use of the term "maintained." He argues that the state records management law in effect at the time would require the Commission to retain White's recommendations, and, therefore, they are "maintained" for the purposes of subsection (m). However, in the context of regulation by the Commission, the requirement that records be "maintained" imposes a duty on the regulated entity to maintain records so that the Commission or another agency may review them. *See*, *e.g.*, 30 Tex. Admin. Code § 111.127(b) (2005) (Tex. Comm'n Envtl. Quality) (owner or operator of incinerator must maintain records of testing results for period of two years and make them available upon request); *id*. § 115.446(8) (owner or operator of offset lithographic printing press shall maintain records for two years and make them available upon request); *id*. § 115.326 (owner or operator of petroleum refinery must maintain log of leaks of volatile organic compounds for five years and make it available upon request). In light of the wording of the statute and the consistent use of the term "maintain" by the Commission, we cannot conclude that White's recommendations were "required to be maintained" as anticipated by subsection (m).

Hopkins also directs us to a number of other statutes cited in pleadings before the district court. Many of these are broad statements of the Commission's responsibilities in protecting the ground water that have no relevance to White's specific erroneous recommendations. Other laws that govern the Commission's response to actual pollution are not implicated because there is no evidence that White's erroneous recommendations actually caused any pollution. Additionally,

13

Hopkins cannot rely on White's misconduct as a violation of laws prohibiting the pollution of water because he did not report these alleged violations to the appropriate law enforcement authority. *See* Tex. Gov't Code Ann. § 554.002(a). We acknowledge that the Commission has broad and vital enforcement responsibility pertaining to pollution. However, Section 26.131 of the water code states that the Railroad Commission of Texas is solely responsible for the prevention of pollution of subsurface water resulting from the activities associated with oil and gas wells. Hopkins's co-workers in the surface casing unit testified that they understood the Railroad Commission, not the Texas Commission on Environmental Quality, to have sole responsibility for responding to pollution of the water resulting from oil and gas wells. There was evidence that the Railroad Commission reviewed the surface casing unit's recommendations for accuracy. Even the recommendation form—which Hopkins participated in designing—states, "Approval of well completion methods for protection of this ground water falls under the jurisdiction of the Railroad Commission of Texas." Based on this record, we conclude that there was no evidence that a reasonable geologist with Hopkins's training and experience could have held a good faith belief that he should report the threat to the ground water resulting from White's inaccurate surface casing recommendations to the Texas Commission on Environmental Quality when the Railroad Commission was widely known to be the appropriate law enforcement agency responsible for addressing pollution of the ground water resulting from oil and gas wells.[5] *See Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 321 (Tex.

---

[5] We note that our conclusion might be entirely different if a lay person, unaware of the Railroad Commission's enforcement role, had reported pollution from oil and gas production to the Commission.

2002).  In sum, Hopkins presented no evidence that White's conduct, in making erroneous surface casing recommendations, violated any law that the Commission was entrusted to enforce.

However, a person need not prove that an actual violation of law occurred to obtain relief under the whistleblower act.  *See Llanes v. Corpus Christi*, 64 S.W.3d 638, 643 (Tex. App.—Corpus Christi 2001, pet. denied).  Hopkins need only demonstrate a good faith belief that the conduct reported was a violation of law and that his belief was reasonable.  *See Needham*, 82 S.W.3d at 320.  In his testimony, Hopkins did not identify any specific law that he believed had been violated.  Rather, he stated his concerns about pollution and made general assertions that incorrect information on recommendations would lead to liability:

> I felt the groundwater was in danger of being contaminated.  I also felt that we were totally liable for these mistakes.  From the time I went to work for surface casing in 1980, it was preached to us, there was memos that came down that you could be sued and the State was not going to back you, and that concerned me.  And they also said the State, the operator and the Railroad Commission were also liable.

Hopkins explained that he believed the potential liability was from a suit by affected landowners.  He made no mention of criminal or administrative penalties.  His own explanation for why he reported White's inaccurate recommendations reveals that he did not anticipate law enforcement action:

> Q.   Were you trying . . . to get Mr. White fired?
>
> A.   No.  All I really cared about is getting it—stop him, make him go file logs,do anything but don't let him make any more recommendations.  Ididn't care what he did.  I didn't care if he stayed there and [sat] in the closet.  Just don't let him work on any more recommendations.

Hopkins did respond to a question from his counsel in which he characterized White's erroneous recommendations as a violation of law:

> Q. Did you express any concern to Mr. Wiley that there—that what was going on could involve a violation of law?
>
> A. Mr. Wiley and I knew each other for a long time, and that was talked about in his presence way prior to any of—that there could be a violation of law about incorrect surface casing recommendations way prior to the time that—that I made my complaint.

But Hopkins never explained what he meant by a violation of law, and on the next page of the transcript he again discussed his fear that the Commission was liable for White's erroneous recommendations and that it could be sued.

In reviewing the district court's JNOV, we credit all favorable evidence that reasonable jurors could believe and disregard all contrary evidence except that which the jury could not ignore. *See City of Keller*, 2005 Tex. LEXIS 436, at *74. Although Hopkins did assert that White's recommendations were "a violation of law," we must view this assertion in the context in which it was made. *See id*. at *16-17. Hopkins's blanket assertion that there was a violation of law cannot be stripped from its context in a way that seems to support the verdict when his testimony as a whole does not. *See id*. Viewing Hopkins's testimony as a whole, he clearly indicated that he reported White's erroneous recommendations because "White was not doing a very good job protecting the groundwater" and because of his concern that he and the Commission could be sued if there was pollution resulting from the recommendations. As such, we find that there is no evidence in the record that Hopkins made a good faith report of a violation of law to an appropriate law enforcement authority as defined under the whistleblower act. *See Needham*, 82 S.W.3d at 320.

16

We overrule Hopkins's issues two through seven. Because we hold that the district court properly entered a take-nothing judgment, we need not consider Hopkins's issues twelve through fourteen (damages and attorney's fees).

**Discovery Requests**

In issues fifteen and sixteen, Hopkins contends that the district court erred by preventing Hopkins from discovering copies of White's erroneous recommendation letters. All that was requested was additional evidence that White made a large number of erroneous recommendations and that the Commission was aware of the problem. In light of our determination that Hopkins's report of White's erroneous recommendations did not constitute a good faith report of a violation of law to an appropriate law enforcement authority, additional evidence of White's recommendations could not have caused the rendition of an improper judgment. *See* Tex. R. App. P. 441.(a)(1). Accordingly, we need not consider whether it was error to deny Hopkins the requested discovery. We overrule Hopkins's fifteenth and sixteenth issues.

**Deemed Admissions**

In issues seventeen and eighteen, Hopkins contends that the district court erred by failing to deem certain requests for admissions to be admitted because the Commission's response was untimely. This case was originally set for trial on June 4, 2001. After a hearing held on May 29, the district court reset the trial for October, struck some of Hopkins's requests for admissions, entered a scheduling order, and sanctioned Hopkins for untimeliness in prosecuting the case. At that hearing, the trial court granted the Commission "an extra thirty days" to respond to Hopkins's remaining requests for admissions. The scheduling order announced on May 29 was not signed until

17

August 16, at which time the Court altered the language on the order setting the due date for the Commission's response as July 2. Hopkins complains that the order improperly extended the deadline for the Commission's response to his requests for admissions an extra four days. The Commission avers that the matter was discussed in correspondence between the parties and that the issue was resolved at a hearing held on August 16. Hopkins has not included the Commission's response, the correspondence, or the transcript of the August 16 hearing in the record. On this scant record, we cannot conclude that the trial court abused its discretion in allowing the Commission four extra days to respond to Hopkins's requests for admissions. We overrule Hopkins's seventeenth and eighteenth issues.

**Spoliation of Evidence**

In issues nineteen and twenty, Hopkins requests that this Court impose sanctions against the Commission for failing to retain the audiotapes of his grievance hearing and documents showing White's false statements. He explains that the documents and tapes contained favorable evidence that White was making false statements on recommendations and that the Commission was aware of Hopkins's reports of White's misconduct as well as White's sexual harassment. Because Hopkins has not preserved error with regard to the directed verdict on the sexual harassment elements of his claim, and because we have determined that Hopkins's reports of White's erroneous recommendations were not good faith reports of a violation of law, the absence of the complained of evidence could not have caused the rendition of an improper verdict. *See* Tex. R. App. P. 44.1(a)(1). We overrule Hopkins's issues nineteen and twenty.

18

**CONCLUSION**

For the reasons set forth above, we overrule all of Hopkins's issues and affirm the district court's take-nothing judgment.

 

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed:   August 11, 2005