

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 2-08-386-CV**

FREQUENT FLYER DEPOT, INC., GEORGE PIRKLE, AND ROBERT PIRKLE

APPELLANTS

V.

AMERICAN AIRLINES, INC.

APPELLEE

------------

FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

This is an accelerated interlocutory appeal from the imposition of a temporary injunction prohibiting appellants Frequent Flyer Depot, Inc. and its officers and owners, George and Robert Pirkle, from engaging in the brokering, purchase, sale, bartering, and solicitation of American Airlines AAdvantage® rewards points. Appellants challenge the injunction on seven grounds: the underlying suit is pre-empted by federal law; the injunction does not preserve

the status quo; there is no enforceable contract between American and its AAdvantage® members prohibiting members from selling their rewards points to third parties; the hearing on the temporary injunction should have been continued for appellants to obtain discovery on their antitrust-related counterclaims; American failed to show an imminent injury; American has an adequate remedy; and principles of equity bar the imposition of an injunction. Because we conclude that there is no reversible error on any of these grounds, we affirm.

### Background

Frequent Flyer admittedly brokers the purchase and sale of airline frequent flyer miles and awards, including AAdvantage® rewards points issued by American to its AAdvantage® members. The Pirkles are officers and owners of Frequent Flyer. American sued appellants and other similar brokers and their principals, contending that the brokering, purchase, bartering, and sale of AAdvantage® rewards is improper. Among its claims against appellants are claims for tortious interference with contract, tortious interference with prospective relations, misappropriation, and fraud. American also asserted a breach of contract claim against Robert Pirkle. After filing suit, American sought and obtained a temporary injunction prohibiting appellants from buying,

2

selling, bartering, or soliciting AAdvantage® rewards during pendency of the suit.

**Standard of Review**

To be entitled to a temporary injunction, the applicant must plead a cause of action and further show both a probable right to recover on that cause of action and a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *Argyle ISD ex rel. Bd. of Trustees v. Wolf*, 234 S.W.3d 229, 236 (Tex. App.—Fort Worth 2007, no pet.); *Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 857 (Tex. App.—Fort Worth 2003, no pet.). A probable right of recovery is shown by alleging a cause of action and presenting evidence tending to sustain it. *Wolf*, 234 S.W.3d at 236; *Fox*, 121 S.W.3d at 857. An injury is irreparable if damages would not adequately compensate the injured party or if they cannot be measured by any certain pecuniary standard. *Butnaru*, 84 S.W.3d at 204; *Wolf*, 234 S.W.3d at 236; *Fox*, 121 S.W.3d at 857.

In an appeal from an order granting or denying a temporary injunction, the scope of review is restricted to the validity of the order granting or denying relief. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993); *Wolf*, 234 S.W.3d at 237; *Fox*, 121 S.W.3d at 857. Whether to grant or deny a request for a temporary injunction is within the trial court's discretion, and we will not reverse its decision absent an abuse of discretion. *Butnaru*, 84 S.W.3d at 204;

3

*Wolf*, 234 S.W.3d at 237; *Fox*, 121 S.W.3d at 857. Accordingly, when reviewing such a decision, we must view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor, and determine whether the order was so arbitrary that it exceeds the bounds of reasonable discretion. *Wolf*, 234 S.W.3d at 237; *Fox*, 121 S.W.3d at 857. A trial court does not abuse its discretion if it bases its decision on conflicting evidence and at least some evidence in the record reasonably supports the trial court's decision. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978); *Wolf*, 234 S.W.3d at 237; *Fox*, 121 S.W.3d at 857. When findings of fact are not requested or separately filed, as in this case, we must uphold the trial court's order on any legal theory supported by the record. *Mabrey v. SandStream, Inc.*, 124 S.W.3d 302, 309 (Tex. App.—Fort Worth 2003, no pet.).

**Pre-emption Claim**

Appellants first contend that American's noncontract claims against them are pre-empted by the Airline Deregulation Act of 1978 (ADA), which provides, in part, that "[e]xcept as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air

4

transportation under this subpart." 49 U.S.C.A. § 41713(b)(1) (West 2007). The United States Supreme Court has held that threatened enforcement by state attorneys general of "fare advertising guidelines" was pre-empted by the ADA. *Morales v. Trans World Airlines, Inc*., 504 U.S. 374, 391, 112 S. Ct. 2031, 2041 (1992). The Court has also held that claims brought by AAdvantage® members against American in state court alleging violations of Illinois's Consumer Fraud Act were pre-empted by section 41713(b)(1). *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 226, 115 S. Ct. 817, 823–24 (1995).

Appellants allege that this suit likewise involves an attempt to regulate prices, routes, or services that is pre-empted by the Act. American counters that any suit brought against it attempting to apply standards to its AAdvantage® program would be pre-empted as an attempt to place state regulations upon prices, routes, or services but that any attempt by it to enforce via state law its own standards as to prices, routes, or services, including frequent flyer mile credits, is not pre-empted as impermissible state regulation. We agree with American.

In *Morales*, the Court considered the effect the advertising restrictions would have on airlines' fares, holding that the restrictions would curtail the airlines' ability to communicate their fares to customers. *Morales*, 504 U.S. at 389, 112 S. Ct. at 2039–40. But it also held that "'[s]ome state actions may

5

affect [airline fares] in too tenuous, remote, or peripheral a manner' to have pre-emptive effect." *Id*. at 391, 112 S. Ct. at 2040.

The Court further distinguished contract actions in *Wolens*, holding that the Act does not shelter airlines from suits "seeking recovery solely for the airlines' alleged breach of its own self-imposed undertakings." *Wolens*, 513 U.S. at 228, 115 S. Ct. at 824. Although concluding that the Act pre-empted AAdvantage® members' Illinois Consumer Fraud Act claims because mileage credits are akin to "rates," the Court nevertheless held that as to contracts affecting such mileage credits, "[m]arket efficiency requires effective means to enforce private agreements." *Id*. at 230, 115 S. Ct. at 824.

After *Morales* and *Wolens*, courts have held that certain personal injury causes of actions against airlines are not pre-empted by the Act. *See, e.g.*, *Hodges v. Delta Airlines, Inc*., 44 F.3d 334, 340 (5th Cir. 1995); *Continental Airlines v. Kiefer*, 920 S.W.2d 274, 283 (Tex. 1996). In explaining its decision in *Kiefer*, the Texas supreme court noted that, "as *Wolens* explains at some length, claims are not [pre-empted] if they do not involve the enforcement of policy-laden state law that too closely approaches a regulatory effect on airlines." *Kiefer*, 920 S.W.2d at 283.

Here, although American has brought mostly tort claims, those claims attempt to protect the vitality of its self-imposed obligations: those arising from

6

the AAdvantage® program.  American's invoking the benefits and protections of state law to protect its own agreements does not have the same impermissible regulatory effect upon prices, routes, or services that Congress was concerned with in enacting section 41713(b)(1).  The Act was intended to pre-empt only those state actions having a regulatory effect upon the airlines rather than to preclude airlines from seeking the benefits and protections of state law to enforce their self-imposed standards, regulations, and contracts.  *See id*.  ("[T]he purpose of ADA preemption is not to absolve airlines from all liability under state law, but to prohibit state regulation of air carriers, direct or indirect.  Congress' concern was 'that the States would not undo federal deregulation with regulation of their own.'"); *see also Hodges*, 44 F.3d at 337 ("Following deregulation, the CAB's [the former Civil Aeronautics Board's] statements implementing the ADA strongly support the view that the ADA was concerned solely with economic deregulation, not with displacing state tort law.").  Indeed, denying American access to state courts for such purposes would seem to have such an impermissible regulatory effect.

Appellants contend that it is unfair to allow the airlines unfettered access to the state courts to enforce their own standards related to frequent flyer programs while denying access to the state courts to the states themselves and other parties attempting to impose standards on the airlines under state law.

7

But the fairness of this application is not for us to decide; we must abide by Congress's intentions when determining whether a suit is pre-empted by the Act. *See Morales*, 504 U.S. at 383, 112 S. Ct. at 2036 (noting that in determining whether a suit is pre-empted under the Act, the question is one of statutory intent, and we must "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose").

We conclude and hold that American's suit against appellants is not pre-empted by section 41713 of the Act. We overrule appellants' first issue.

## Status Quo

In their second issue, appellants contend that the injunction fails to preserve the status quo. According to appellants, they have been operating their business since 2002; they allege that American has known about their activities since that time, or at least since the beginning of the lawsuit. Appellants claim that because American knowingly allowed their activities to continue for some time, the last peaceable uncontested status is to allow appellants to continue their business.

The purpose of a temporary injunction is to preserve the status quo until a trial on the merits. *Butnaru*, 84 S.W.3d at 204; *Wolf*, 234 S.W.3d at 237; *Fox*, 121 S.W.3d at 857. "Status quo is defined as 'the last, actual, peaceable,

8

noncontested status which preceded the pending controversy.'" *Universal Health Servs., Inc. v. Thompson*, 24 S.W.3d 570, 577 (Tex. App.—Austin 2000, no pet.) (quoting *Transp. Co. v. Robertson Transps., Inc*., 152 Tex. 551, 261 S.W.2d 549, 553–54 (1953)); *see Wolf*, 234 S.W.3d at 237.

George Pirkle testified at the temporary injunction hearing that an attorney for American called him "several times" in 2002 about domain names connected to Frequent Flyer's website, frequentflyerdepot.com. The attorney told George that those domain names constituted trademark infringement and that American wanted them back. George told the attorney that the domain names were connected to frequentflyerdepot.com, and he agreed to give them to American. Although George testified that the attorney did not tell him to stop operating frequentflyerdepot.com, he also admitted that he could not recall whether they had talked about Frequent Flyer's brokerage business. He also said that the lawyer never told him that American would permit Frequent Flyer to sell AAdvantage® miles.

Since 2005, American has stopped travel on tickets sold by Frequent Flyer by freezing the accounts of AAdvantage® members who American discovers have improperly sold their rewards points to a third party. But George Pirkle admitted that American successfully discovers and stops travel on Frequent Flyer's transactions only between about three and four to ten percent

9

of the time. American's representative testified that these "policing" efforts are disruptive, causing operational difficulties for American and diverting resources away from legitimate ticketing.

When American deposed George Pirkle as the designated representative of Frequent Flyer,[1] he admitted that Frequent Flyer "brokers" AAdvantage® rewards points; in other words, Frequent Flyer buys rewards points from AAdvantage® members and sells those points to third parties. He agreed that American had asked Frequent Flyer to stop doing so "earlier this year [2008]," and he confirmed that Frequent Flyer had refused. American sought the temporary injunction hearing shortly after taking appellants' depositions.

If, as American claims, appellants' activities are in violation of its agreements with AAdvantage® members,[2] the last peaceable, noncontested status is for appellants to refrain from selling AAdvantage® rewards points. There is no evidence that American knew of Frequent Flyer's brokering activities in 2002 when its attorney contacted George Pirkle about the domain names; as George himself testified, he bought around 136 domain names when he started. Likewise, there is no evidence that American knew in 2005 and

---

[1] American says in its brief that the depositions had been delayed due to George Pirkle's poor health; appellants do not dispute this.

[2] Appellants do not challenge on appeal whether American proved a probable right to recover on its causes of action.

10

later that the AAdvantage® accounts it was freezing for the improper sale of rewards points were sold through Frequent Flyer in particular.[3] Even so, it is a reasonable inference that American could not have known the full extent of Frequent Flyer's activities, considering George's testimony that Frequent Flyer transactions were "caught" only between three to ten percent of the time.

American moved for a temporary injunction when it learned the full extent of Frequent Flyer's activities and Frequent Flyer refused to discontinue those activities even in the face of American's suit. American should not be denied its ability to obtain injunctive relief to which it is otherwise entitled simply because it took some time for it to discover Frequent Flyer's admittedly concealed activity. *See Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 428–29 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding that complete preservation of status quo in case involving improper use of trade secrets to operate competing chemical sales company was that new company would not be able to sell any of the disputed chemicals). We hold that the trial court's injunction properly preserves the status quo pending resolution of the suit. Accordingly, we overrule appellants' second issue.

---

[3] George and Robert both testified that Frequent Flyer instructs customers who purchase rewards points from it to tell American that the points are a gift and that such representations are lies.

**Enforceability of Agreement Between American and AAdvantage® Members**

Appellants contend in their third issue that there is no evidence that American has a binding contract with its AAdvantage® members such that appellants' actions in buying and selling, and inducing AAdvantage® members to buy and sell, AAdvantage® rewards points are improper as alleged by American in its tort claims.

To become an AAdvantage® member, a person must agree to American's online User Agreement, which contains the following provision: "At no time may AAdvantage® mileage credit or award tickets be purchased, sold or bartered. Any such mileage or tickets are void if transferred for cash or other consideration." The User Agreement also contains other provisions allowing American to change the terms of the AAdvantage® program, upon which appellants base their claim that the User Agreement lacks mutuality and is, therefore, unenforceable. Specifically, the User Agreement states that American may,

> in its discretion, change the AAdvantage® program rules, regulations, travel awards, and special offers at any time with or without notice. . . . American Airlines may make one or more of [certain enumerated] changes at any time even though such changes may affect your ability to use the mileage credit or awards

12

that you have already accumulated.  American Airlines reserves the right to end the AAdvantage® program with six months notice.[4]

According to appellants, this clause shows a fatal lack of mutuality, rendering the entire agreement unenforceable.

A bilateral contract is one in which there are mutual promises between two parties to the contract, each being both a promisor and a promisee. *Hutchings v. Slemons*, 141 Tex. 448, 174 S.W.2d 487, 489 (1943); *The Colony, Tex. v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 725 (Tex. App.—Fort Worth, no pet. h.).  A bilateral contract must be based upon a valid consideration, in other words, mutuality of obligation.  *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 409 (Tex. 1997); *The Colony*, 272 S.W.3d at 725. Consideration may consist of either benefits or detriments to the contracting parties; it may consist of some right, interest, profit, or benefit that accrues to one party, or alternatively, of some forbearance, loss, or responsibility that is undertaken or incurred by the other party.  *The Colony*, 272 S.W.3d at 725; *In re C & H News Co.*, 133 S.W.3d 642, 647 (Tex. App.—Corpus Christi 2003, orig. proceeding).  The existence of a written contract presumes consideration

---

[4] The agreement also states that American "may amend its rules of the Program at any time without notice."

13

for its execution.  *The Colony*, 272 S.W.3d at 725; *Doncaster v. Hernaiz*, 161 S.W.3d 594, 603 (Tex. App.—San Antonio 2005, no pet.).

A contract that lacks mutuality of obligation is illusory and void and thus unenforceable.  *The Colony*, 272 S.W.3d at 725; *Tex. S. Univ. v. State St. Bank & Trust Co.*, 212 S.W.3d 893, 914 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).  A promise is illusory when it fails to bind the promisor who retains the option of discontinuing performance without notice.  *Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 645 (Tex. 1994); *The Colony*, 272 S.W.3d at 725; *Rogers v. Alexander*, 244 S.W.3d 370, 382 (Tex. App.—Dallas 2007, no pet. h.).  But mutuality in each clause of a contract is not required when consideration is given for the contract as a whole.  *Howell v. Murray Mortgage Co.*, 890 S.W.2d 78, 87 (Tex. App.—Amarillo 1994, writ denied).

The test for mutuality is applied and determined when enforcement is sought, not when the promises are made.  *Hutchings*, 174 S.W.2d at 489; *Cherokee Commc'ns, Inc. v. Skinny's, Inc.*, 893 S.W.2d 313, 316 (Tex. App.—Eastland 1994, writ denied).  Accordingly, even if an illusory promise renders a contract unilateral, consideration can still be established by part performance by the promisee.  *Hutchings*, 174 S.W.2d at 489; *Cherokee Commc'ns*, 893 S.W.2d at 316; *cf. Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 650–51 (Tex. 2006) (distinguishing general rule as

14

to covenants not to compete, which, by statute, must be enforceable when entered into).

Here, the clause pointed to by appellants allows American to terminate the program upon notice and allows American to change the terms of the program with or without notice. However, that does not mean American is without obligation to its members under the User Agreements. In consideration for AAdvantage® members' purchasing paid travel on American and its partner airlines, and purchasing other services from specified providers, American agrees to provide rewards points to those customers. It is nonsensical for appellants to argue that no enforceable agreement exists when their entire business depends on the enforceability of that agreement. In other words, if American has no obligation to issue a ticket in exchange for rewards points when an AAdvantage® member fully complies with the User Agreement, appellants are ill-positioned to complain about the trial court's enjoining their activities, which depend on American's complying with its obligation even when a ticket is obtained in violation of the applicable User Agreement. Appellants cannot have it both ways.

Additionally, as appellants point out in their brief, American's misappropriation claim "as alleged requires a showing that [appellants] 'wrongfully[]obtained award tickets.'" The key word here is "obtained," in the

15

past tense. It is undisputed that American has issued tickets in exchange for rewards points purchased through Frequent Flyer. With regard to those tickets, then, American has performed under the applicable User Agreements. Thus, even if American's consideration was illusory when it entered into the applicable User Agreements, its subsequent performance under those agreements established consideration, rendering those agreements enforceable. *See Hutchings*, 174 S.W.2d at 489; *Cherokee Commc'ns*, 893 S.W.2d at 316.

The same holds true for tickets that American will issue in exchange for rewards points in the future. If American does not issue any such tickets, then the question of whether American can enforce the no-sale rule is moot. But if American does issue tickets in exchange for rewards points acquired through purchase or barter—then it will again have partially performed under the User Agreements at issue, thus establishing the necessary consideration to render those agreements enforceable. *See Hutchings*, 174 S.W.2d at 489; *Cherokee Commc'ns*, 893 S.W.2d at 316.[5]

---

[5] Moreover, we note that, as a practical matter, American is effectively conceding the enforceability of the User Agreements. Appellants criticize American for relying on cases construing similar airline passenger incentive agreements because in those cases the passengers themselves—who were seeking to enforce the agreements—conceded the existence of enforceable agreements. *See Mozingo v. Alaska Air Group, Inc.*, 112 P.3d 655, 661–62 (Alaska 2005); *Grossman v. USAir, Inc.*, 33 Phila. Co. Rptr. 427, 431–32 (C.P. 1997). But the key factor that makes this case similar to those is that the party

16

For these reasons, we conclude and hold that American's AAdvantage® User Agreements do not fail for lack of mutuality, and we overrule appellants' third issue.

## Continuance

In their fourth issue, appellants claim that the trial court abused its discretion by refusing to continue the temporary injunction hearing.

Appellants moved for a continuance both before and after the temporary injunction hearing on the ground that American had refused to produce documents in response to appellants' Third Request for Production. Appellants requested these documents in conjunction with their counterclaims against American for interference with contractual and business relations, tortious interference with prospective relations, a declaratory judgment that appellants' actions in purchasing and selling AAdvantage® rewards points are not improper, violations of the Texas Free Enterprise Act, violations of the DTPA, and injunctive relief. In particular, appellants claimed they needed additional discovery on their antitrust claims, their equitable defenses, and whether American had an adequate remedy at law. The gist of appellants'

seeking enforcement—here, American—effectively concedes enforceability of the agreements by attempting to enforce them.

counterclaims is that American is a competitor and is unlawfully attempting to restrict their ability to maintain a competing business.

Appellants' complaint fails initially because they failed to support their written motion for continuance with an affidavit as required by rule 251. Tex. R. Civ. P. 251. Generally, when a movant fails to comply with rule 251, we presume the trial court did not abuse its discretion by denying a motion for continuance. *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986); *Sw. Country Enters., Inc. v. Lucky Lady Oil Co.*, 991 S.W.2d 490, 493 (Tex. App.—Fort Worth 1999, pet. denied); *see also Tri-Steel Structures, Inc. v. Baptist Found. of Tex.*, 166 S.W.3d 443, 448–49 (Tex. App.—Fort Worth 2005, pet. denied) (holding that trial court did not abuse its discretion by denying motion for continuance when not in proper "affidavit form").

Appellants did not comply with rule 251; thus, we conclude and hold that the trial court did not abuse its discretion by denying their motion for continuance. Moreover, if necessary to protect a proven legal right, a temporary injunction may issue even if it has the effect of restraining competition, so long as it is narrowly tailored to preserve the status quo. *Sharma*, 231 S.W.3d at 428–29 ("While ordinarily a temporary injunction should operate as a corrective rather than a punitive measure, when a choice must be made between a failure to provide adequate protection of a recognized

legal right and the punitive operation of the writ, the latter course must be taken. "). We overrule appellants' fourth issue.

## Proof of Injury

Appellants' fifth issue complains that American failed to meet its burden to prove that it was injured.

American alleged that it is injured by Frequent Flyer's actions because customers who purchase void rewards points from appellants (because those purchases violate the no-sale rule) would likely have purchased tickets from American had they not obtained the void tickets; thus, those customers likely displaced other AAdvantage® members or other paying American customers who would have purchased tickets had the seats not been occupied by travelers using the void tickets. American also alleged that it lost goodwill with AAdvantage® members in that those members were prevented from using their AAdvantage® rewards points because seats were occupied by persons using the void tickets. Appellants contend that American "offered no evidence of any identified passenger, actual or potential, who suffered any aspect of [American's] litany of claimed injuries."

A party proves irreparable injury for injunction purposes by proving that damages would not adequately compensate the party or cannot be measured by any certain pecuniary standard. *Butnaru*, 84 S.W.3d at 204; *Fox*, 121

19

S.W.3d at 857.  An injunction is not proper when the claimed injury is merely speculative, however; fear and apprehension of injury are not sufficient to support a temporary injunction.  *Jordan v. Landry's Seafood Rest., Inc.*, 89 S.W.3d 737, 742 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (op. on reh'g).

American offered the testimony of Jim Balsom, Manager of AAdvantage® systems and partner support.  He testified without objection that American is reluctant to challenge the veracity of AAdvantage® members' representations when booking travel because "that would not engender goodwill[;] in fact, [it would] probably cost [American] significant goodwill if we were to do that."  Additionally, he testified that such an inquiry "[w]ould take [a] significant amount of time and add significantly to [American's] costs."

Balsom further testified that brokering operations such as Frequent Flyer's "cause[] customers to question [American's] ability to manage and maintain the program and deliver the benefits that we've promised to customers."  He said that when American discovers a void transaction due to Frequent Flyer's activities, its business is disrupted and it must divert resources away from legitimate customers to deal with the void transactions.  He also testified that freezing the AAdvantage® accounts at issue causes ill will for the member.

20

Balsom further stated that dealing with these types of transactions causes "operational difficulties or issues."

Regarding displacement, Balsom testified that when Frequent Flyer sells an AAdvantage® member's rewards points to a third party, that third party displaces a customer "who would either pay cash for that ticket or . . . who would redeem AAdvantage® miles for the seat." He said it also "does use resources through [American's] reservations office [and] potentially AA.com for other business purposes" instead of valid ticket sales.

Appellants challenge American's displacement evidence, pointing to Securities and Exchange Commission reports filed by AMR, American's parent company, showing that, generally, between 2003 and 2007, twenty to thirty percent of seats on American's flights were empty. It also points to statements in those reports to the effect that, with respect to the AAdvantage® program, AMR "believes displacement of revenue passengers is minimal given the Company's load factors, its ability to manage frequent flyer inventory, and the relatively low ratio of free award usage to total passengers boarded." According to appellants, absent evidence from specific flights on which displacement occurred, American cannot overcome this evidence of empty seats on its flights.

21

The SEC filings do not give information for specific flights; indeed, the vacancies in paying seats may be higher due to higher numbers of business travelers paying a lower price for rewards points tickets through Frequent Flyer than paying for typical full-fare seats.[6]  And the isolated statement that displacement is minimal is clearly in relation to the function of the program according to its guidelines; in other words, passenger displacement is minimal when the program is operating without outside influences.

American points to additional evidence as supporting the proof of injury requirement, such as the fact that it is virtually impossible to police appellants'

---

[6] As the United State Supreme Court noted in *Morales*,

> The expenses involved in operating an airline flight are almost entirely fixed costs; they increase very little with each additional passenger.  The market for these flights is divided between consumers whose volume of purchases is relatively insensitive to price (primarily business travelers) and consumers whose demand is very price sensitive indeed (primarily pleasure travelers). Accordingly, airlines try to sell as many seats per flight as possible at higher prices to the first group, and then to fill up the flight by selling seats at much lower prices to the second group (since almost all the costs are fixed, even a passenger paying far below average cost is preferable to an empty seat).  In order for this marketing process to work, and for it ultimately to redound to the benefit of price-conscious travelers, the airlines must be able to place substantial restrictions on the availability of the lower priced seats (so as to sell as many seats as possible at the higher rate), and must be able to advertise the lower fares.

504 U.S. at 389, 112 S. Ct. at 2040.

actions (when American discovers a void ticket, Frequent Flyer simply buys more miles and issues a new one), that American has to devote resources to investigating and policing appellants' actions that disrupt its operation and divert its resources from legitimate customers, and the unobjected-to evidence that American's inability to police activities such as Frequent Flyer's causes AAdvantage® members to question its ability to effectively run the program.

Disruption to a business can be irreparable harm. *Lavigne v. Holder*, 186 S.W.3d 625, 629 (Tex. App.—Fort Worth 2006, no pet.); *David v. Bache Halsey Stuart Shields, Inc.*, 630 S.W.2d 754, 757 (Tex. App.—Houston [1st Dist.] 1982, no writ) ("This harm would not only disrupt the organized business dealings of Bache but would also threaten customer confidence in Bache's handling of their private affairs, and probably cause Bache to lose not only customers but profits as well."). Moreover, assigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy. *Martin v. Linen Sys. for Hosps., Inc.*, 671 S.W.2d 706, 710 (Tex. App.—Houston [1st Dist.] 1984, no writ).

American offered specific, undisputed evidence of intangible harm to its business, including the AAdvantage® program, resulting from appellants' actions. Balsom's testimony was not speculative and is supported by the Pirkles' own testimony about Frequent Flyer's operations, specifically, its

23

instructions to AAdvantage® members intended to conceal its activities from American.

We conclude and hold that American presented evidence of an irreparable injury. Thus, we overrule appellants' fifth issue.

**Adequate Remedy**

In their sixth issue, appellants claim that if American presented sufficient evidence to meet its burden of proof as to injury, that same evidence shows that American has an adequate remedy in damages. Specifically, appellants claim that damages can be calculated easily from AMR's SEC filings if American can provide the identity of specific displaced passengers. They also contend that American cannot show lost profits because it has not made any profit since at least 2002.

American counters that even if damages can be assigned to displaced passengers, appellants "do not refute the evidence . . . that their conduct disrupts American's business . . . in many ways and affects the reputation and loyalty it has developed over years with its customers."

An adequate remedy is one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief. *Mabrey*, 124 S.W.3d at 317. Damages are an inadequate remedy if they are difficult to calculate. *Id*. at 318–19.

24

According to American, while the evidence appellants point to may show that some of its damages are calculable, it does not show a way to calculate damages for American's claims of loss of goodwill and other intangibles. We agree. As we have already stated, the intangible types of injuries testified to by Balsom are the types of injuries to which a dollar value may not easily be assigned. *Martin*, 671 S.W.2d at 710. A remedy is not adequate simply because some of the proven damages are calculable. *See Tex. Indus. Gas v. Phoenix Metallurgical Corp*., 828 S.W.2d 529, 532 (Tex. App.—Houston [1st Dist.] 1992, no writ) ("For a legal remedy to be adequate, it must give the applicant complete, final, and equal relief."); *see also Towers v. Grogan*, No. 01-97-00946-CV, 1998 WL 191760, at *4 (Tex. App.—Houston [1st Dist.] Apr. 23, 1998, no pet.) (not designated for publication) (holding that although some breach of contract damages were calculable, specific damages for which Grogan sought injunctive relief were intangibles, incapable of being measured by damages).

We conclude and hold that American proved that damages are not adequate to fully compensate it for its injuries. Accordingly, we overrule appellants' sixth issue.

25

## Equitable Concerns

Appellants' seventh issue raises equitable claims, including laches and unclean hands.

Appellants first contend that American's temporary injunction claim is barred by laches because American has failed to take action against appellants despite knowing since 2002 the type of business Frequent Flyer was engaged in. Appellants claim Frequent Flyer has been prejudiced by American's inaction because the Pirkles never would have expanded the business since 2002 had they known American objected to Frequent Flyer's conduct.

A party asserting the defense of laches must show both an unreasonable delay by the other party in asserting its rights and harm resulting to it because of the delay. *Rogers v. Ricane Enters. Inc.*, 772 S.W.2d 76, 80 (Tex. 1989); *In re Roxsane R.*, 249 S.W.3d 764, 771 (Tex. App.—Fort Worth 2008, orig. proceeding). Here, we have already discussed the lack of evidence that American knew or should have known of appellants' activities when its lawyer contacted George Pirkle in 2002 about the domain names. In addition, we have also pointed to the evidence that Frequent Flyer purposefully concealed its dealings from American and instructed AAdvantage® members to do the same. Accordingly, we do not believe that the evidence shows that American deliberately slumbered on its rights with regard to appellants' conduct.

Moreover, there was evidence from which the trial court could have concluded that appellants failed to show prejudice; the trial court elicited testimony from George that Frequent Flyer's expansion also had to do with increased trade in other airlines' frequent flyer miles. George also testified that he had been aware of American's no-sale provision since at least 2005 because American had stopped travel on tickets bought with rewards points sold by Frequent Flyer before that time. Accordingly, we conclude and hold that the trial court did not abuse its discretion by rejecting appellants' claim of laches.

Appellants contend that American has unclean hands because "the evidence shows that [American] is part of an illegal conspiracy with regard to the antitrust laws of the United States and the State of Texas." According to appellants, the temporary injunction prevents (and American's suit seeks to prevent) them from competing with American. Appellants also claim that American must do equity to obtain equity and that American has failed to do so by authorizing Points.com and its airline partners to trade with members for AAdvantage® rewards points. This argument appears to incorporate appellants' antitrust and anticompetition claims. But as we have already held, an otherwise proper injunction will not be rendered improper by claims that such an injunction would have a preclusive effect on competition. *See Sharma*, 231 S.W.3d at

27

429.   Thus, we conclude and hold that the trial court did not abuse its discretion by rejecting appellants' equitable defenses.

We overrule appellants' seventh issue.

### Conclusion

Having overruled all of appellants' issues, we affirm the trial court's order granting the temporary injunction.

TERRIE LIVINGSTON
JUSTICE

PANEL:  LIVINGSTON, DAUPHINOT, and MCCOY, JJ.

DELIVERED:  February 26, 2009