

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00294-CV

KEITH FISCHER; HELEN
LORRAINE FISCHER; AND KHBD,
INC. D/B/A PRECISION BUILDERS
AND D/B/A PRECISION
CONCRETE

APPELLANTS

V.

MARK RIDER

APPELLEE

----------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

This is an accelerated interlocutory appeal from a temporary injunction. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (Vernon 2008). In three issues, Appellants Keith Fischer, Helen Lorraine Fischer, and KHBD, Inc. d/b/a

---

[1]*See* Tex. R. App. P. 47.4.

Precision Builders and d/b/a Precision Concrete argue that the trial court's temporary injunction is void because it failed to include a date for the trial on the merits and that the trial court abused its discretion by finding evidence existed that Appellee Mark Rider would suffer irreparable injury in the absence of a temporary injunction and by finding evidence existed that such injury to Rider was imminent. We will affirm.

## II. AMENDED TEMPORARY INJUNCTION SETS TRIAL DATE

After Appellants perfected this appeal, the trial court signed an amended temporary injunction. The amended temporary injunction is essentially the same as the original injunction except that it sets a trial date. Appellants concede in their reply brief on appeal that their first issue, claiming that the temporary injunction is void for failure to set a trial date, has been mooted by the trial court's amended temporary injunction that sets a trial date. Accordingly, we overrule Appellants' first issue.[2]

---

[2]The trial court's amended temporary injunction sets the case for trial on January 31, 2010. Despite the clerical error in the year the case is set for trial, the amended order meets the requirements of rule 683. Tex. R. Civ. P. 683; *see Miller v. K & M P'ship*, 770 S.W.2d 84, 88 (Tex. App.—Houston [1st Dist.] 1989, no writ) (declining to find that typographical error in trial date—which was prior to date of order—in temporary injunction order rendered order void).

We note that the record was prepared, briefing was completed, and this case was submitted to this court on December 1, 2010.

### III. TRIAL COURT DID NOT ABUSE ITS DISCRETION BY GRANTING A TEMPORARY INJUNCTION

### A. Standard of Review

A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (citing *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993)). A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Id.*

To be entitled to a temporary injunction, the applicant must plead a cause of action and further show both a probable right to recover on that cause of action and a probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204; *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 220 (Tex. App.—Fort Worth 2009, pet. denied), *cert. denied*, 120 S. Ct. 2061 (2010). A probable right of recovery is shown by alleging a cause of action and presenting evidence tending to sustain it. *Frequent Flyer Depot*, 281 S.W.3d at 220. An injury is irreparable if damages would not adequately compensate the injured party or if they cannot be measured by any certain pecuniary standard. *Butnaru*, 84 S.W.3d at 204; *Frequent Flyer Depot*, 281 S.W.3d at 220.

In an appeal from an order granting or denying a temporary injunction, the scope of review is restricted to the validity of the order granting or denying relief. *Walling*, 863 S.W.2d at 58; *Frequent Flyer Depot*, 281 S.W.3d at 220. Whether to grant or deny a request for a temporary injunction is within the trial court's

discretion, and we will not reverse its decision absent an abuse of discretion. *Butnaru*, 84 S.W.3d at 204; *Frequent Flyer Depot*, 281 S.W.3d at 220. Accordingly, when reviewing such a decision, we must view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor, and determine whether the order was so arbitrary that it exceeds the bounds of reasonable discretion. *Frequent Flyer Depot*, 281 S.W.3d at 220. A trial court does not abuse its discretion if it bases its decision on conflicting evidence and at least some evidence in the record reasonably supports the trial court's decision. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978); *Frequent Flyer Depot*, 281 S.W.3d at 220. When findings of fact are not requested or separately filed we must uphold the trial court's order on any legal theory supported by the record. *Frequent Flyer Depot*, 281 S.W.3d at 220.

## B. The Temporary Injunction Hearings

KHBD is a close corporation that builds million-dollar homes. Michael Cannaday is the builder and construction manager for KHBD, and Keith Fischer and Rider own all of the KHBD stock. Keith owns 75% of the stock; Rider owns 25% of the stock. Keith serves as the president, vice president, secretary, treasurer, and the only director of KHBD.

Rider filed suit alleging that Keith and Cannaday had fraudulently induced him (Rider) to finance "millions of dollars of residential construction for KHBD . . . through the fraudulent sale of stock and other devices" and then "refused to make payments to [him] in accordance [with] the terms of the transactions . . . ."

4

Rider alleged causes of action for statutory fraud, common law fraud, fraud by nondisclosure, securities fraud, fraudulent inducement, breach of fiduciary duty, constructive fraud, aiding and abetting, violation of the Texas Close Corporation Act, breach of contract, theft, money had and received, negligent misrepresentation, and conspiracy. Rider also requested the imposition of a constructive trust/equitable lien; an order for equitable accounting; exemplary damages; the appointment of a receiver, provisional director, and/or custodian; and a temporary restraining order and injunctive relief.

Rider's temporary injunction hearing was heard at three different hearings. Keith, Rider, Cannaday, and Lanny Wilkinson testified concerning the temporary injunction.[3] The trial court did not make findings of fact or conclusions of law. After the hearings, the trial court entered a temporary injunction finding that there was evidence "that harm is imminent to plaintiff, and if the court does not issue a temporary injunction plaintiff will be irreparably injured." The trial court also found that "KHBD has made balloon loans in 2009, with no interim interest payments required until maturity, to Keith Fischer in the approximate amount of $83,939.02 and Michael Cannaday in the approximate amount of $93,253.47" and that "[t]he court has significant concerns at this juncture about the propriety of loans already made by KHBD to Keith Fischer and Michael Cannaday and future loans."

---

[3]The trial court also heard testimony from proposed receiver David Morraine, but that testimony is not pertinent to the arguments Appellants raise regarding the temporary injunction.

5

Viewing the evidence as we must in the light most favorable to the trial court's ruling, the record reflects that Keith and Rider had an oral agreement that Cannaday would be paid $10,000 per month and that Rider would be paid sixty-six percent of what Cannaday was paid. For several years, KHBD paid Cannaday his monthly salary plus other expenses, but Rider was told by Keith that KHBD did not have money to pay him.

Yet, KHBD had loaned Keith approximately $70,000 in 2009 in lieu of paying him for negotiating contracts and deals with banks, for looking over bills, and for making sure that products were properly delivered. Keith said that KHBD paid for his vehicle in 2006 and that he had received checks for rent because KHBD offices out of his home. According to Keith, KHBD still owes him $620,103.84 of the monies he initially invested in KHBD.[4]

Keith said that Cannaday has been paid $483,707 since 2006, plus $13,818 for out-of-pocket expenses. Keith said that he told Rider about the loan that KHBD was making to Cannaday so that he could finish his home. Keith said that he never told anyone that Cannaday had taken kickbacks.

---

[4]Keith was questioned regarding the bankruptcy petition that he had filed, and he admitted that it did not list KHBD or that he had a wife and that he had reported his sole source of income as unemployment benefits, despite that he was paid $267,863 (according to another exhibit). Keith also admitted that the KHBD tax returns did not reflect the $13,000 that he was paid.

Keith testified that Rider was supposed to receive approximately sixty-six percent of what Cannaday was paid, "assuming the profits were there."[5] However, Keith said that Rider has not been paid sixty-six percent of Cannaday's compensation since 2005 because the corporation's profits "aren't there." Keith testified that KHBD performed $77,881.02 worth of work on Rider's home because that is how Rider wanted to be compensated for his stock. Additionally, KHBD had paid $78,165.48 of credit charges for Rider and had made additional payments to him in the amount of $85,455.99. Keith testified that Rider has been paid $263,566.93 plus $3,100 for his stock and that Rider still has his stock.

Currently, Rider owns 2,500 shares of KHBD, and Keith owns 7,500 shares of KHBD. Keith testified that when shares of KHBD were transferred among him, his wife, and Cannaday, they were transferred at one cent per share; he admitted that Rider had paid $300 per share for his KHBD stock. Keith said that no dividends were ever issued because there were "none to pay."

Two days after a December 4, 2009 shareholders' meeting, Keith received a fax from Rider requesting KHBD's tax returns, and KHBD's bookkeeper sent a letter to Rider stating that they would produce the documents in thirty days. However, as of the date of the hearing, no date had been set for Rider to inspect the books.

---

[5]Keith noted that Plaintiff's Exhibit 4 showed that KHBD expected to make $1.4 million in 2000, but he said that they did not realize that amount.

Rider testified that he had paid $750,000 for stock in KHBD and had received approximately $280,000 back. He was last paid in 2007. He said that he has been requesting financial information from KHBD since 2005 but had not received information from KHBD until the information was subpoenaed.

Rider discussed several exhibits showing loans made by KHBD to Cannaday and to Keith. One exhibit showed that in 2009, KHBD had made loans to Cannaday totaling $93,253.47 and to Keith totaling almost $84,000. All of the loans were unsecured and had no timetable for repayment. Rider testified that he does not believe that Cannaday can repay his loans to KHBD because he owes the IRS over $400,000.

With the loans and monthly salary (which totaled $139,500),[6] KHBD paid Cannaday $232,753.47 in 2009. From 2006 to 2009, Cannaday's pay plus the cost of his vehicles totaled $531,000. Rider testified that he should receive two-thirds of that or $354,319 plus $138,818.68 for his two-thirds of Cannaday's pay prior to 2006.

Rider was concerned that KHBD was "cooking the books" because Cannaday's salary was underreported by approximately $500,000, Moreover, Rider stated, "They've made loans to themselves, substantially draining the company of all assets, without my permission or my knowledge, which is a violation of [the] shareholders agreement." Rider also testified that Keith and

---

[6]Rider's understanding was that Cannaday's salary was a fixed expense of $10,000 per month.

8

Cannaday had transferred stock back and forth without Rider's permission and had done so for one cent per share. Moreover, Rider testified that Keith had admitted on December 4, 2009 that Cannaday had taken kickbacks totaling approximately $400,000 and that he was no longer an owner of KHBD.

Rider summarized the misrepresentations that were made to him: (1) Keith misrepresented Cannaday's salary for 2003, 2004, and 2005 on the reports that Rider received twice a year; (2) Keith misrepresented that a shareholders' agreement was in place and then later denied that there was one in place;[7] (3) Keith misrepresented that he owned the company and misrepresented that Cannaday had ever owned the company; (4) Keith misrepresented in 2000 that KHBD was doing honest work with integrity with its homeowners and subcontractors; (5) Keith misrepresented that the stock was worth $300 per share and then traded it for one cent per share; (6) Keith misrepresented that if Rider bought a lot in Corinth that KHBD would make the interest payments until the lot sold, but then Keith told Rider that he would not make the payments; (7) Keith misrepresented that he would not pass stock to dodge federal bankruptcy rules; (8) Keith misrepresented that KHBD would have an "S election," but Keith failed to follow through with making that election; (9) both Keith and Cannaday misrepresented "a certain situation involving a crossing of boundaries and the

---

[7]Rider believes that there may be more than one shareholders' agreement.

9

building of . . . a personal home that was to have happened in Corinth"; and (10) Keith and Cannaday made loans to themselves without Rider's permission.

Michael Cannaday, the builder[8] and construction manager for KHBD, testified that KHBD pays him $10,000 per month and that KHBD furnishes him with a cell phone and a truck that can pull heavy equipment. He testified that he has not accepted any kickbacks and that he has not transferred stock to avoid tax liabilities. He said that he does not currently own any KHBD stock and is not an officer or director.

He said that his relationship with Rider deteriorated when he filed for divorce from Rider's stepdaughter. Cannaday testified that Rider knew that KHBD was paying for the cost overruns on Cannaday's home and that he intends to pay back the $87,000 loan for those cost overruns. Cannaday also testified that he has IRS liens totaling $400,000.

Lanny Wilkinson, who owns multiple companies, testified that Rider contacted him in late November about a problem he was having with his KHBD shares. Wilkinson told Rider that he had a right to know what was going on with KHBD, and Rider invited him to come to the December 4, 2009 shareholders' meeting. When they showed up for the shareholders' meeting, Wilkinson used a proxy executed by Rider and asked Keith for KHBD's tax returns, financials, and construction documents. Wilkinson said that Keith would not produce any

---

[8]Cannaday admitted that he was denied a builder's license in 2004 due to "prior criminal activity."

documents at the meeting, but Keith told him that he knew Cannaday had taken kickbacks and that was why Cannaday no longer had access to the KHBD checkbook. Keith also told Wilkinson that he would "never testify to that in court."

### C. Evidence Supports Findings of Irreparable Injury and Imminent Harm

In their second and third issues respectively, Appellants argue that the trial court abused its discretion by finding that in the absence of a temporary injunction Rider would suffer irreparable injury and that such harm to Rider was imminent.

A probable, imminent, and irreparable injury is the third element necessary to obtain a temporary injunction. *Butnaru*, 84 S.W.3d at 204; *Blackthorne v. Bellush*, 61 S.W.3d 439, 444 (Tex. App.—San Antonio 2001, no pet.). A party proves irreparable injury for injunction purposes by proving that damages would not adequately compensate the party or cannot be measured by any certain pecuniary standard. *Butnaru*, 84 S.W.3d at 204; *Frequent Flyer Depot*, 281 S.W.3d at 227. An injury is also irreparable if the plaintiff does not have an adequate remedy at law, and a plaintiff does not have an adequate remedy at law if the defendant is insolvent. *Blackthorne*, 61 S.W.3d at 444.

The evidence presented at the temporary injunction hearings demonstrated that KHBD was making unsecured loans to Keith and Cannaday while refusing to pay Rider because there were allegedly no profits to pay him. There was some evidence that KHBD's tax documents did not reflect payments

11

to Keith and that payments to Keith were not reflected on his bankruptcy petition. There was also some evidence that Cannaday may have accepted kickbacks. Moreover, Keith, Helen, and Cannaday were trading shares among one another for one cent, while Rider paid $300 per share for his shares. All of this evidence regarding KHBD's financial situation demonstrated that Rider was at risk of not ever being repaid for his shares and that he could suffer irreparable injury, as well as imminent harm, due to the inability to police Keith, who is the majority shareholder, sole director, president, vice president, secretary, and treasurer of KHBD. The record clearly supports the trial court's "significant concerns" over the propriety of KHBD's unsecured loans to Keith and Cannaday, as well as the trial court's concern that such financial practices would continue in the future without a temporary injunction in place.

Because there is at least some evidence in the record reasonably supporting the trial court's decision, we hold that the trial court's decision to grant a temporary injunction is not arbitrary and did not exceed the bounds of its reasonable discretion because that was the only way to deny Keith the ability to continue to withdraw funds from KHBD to Rider's detriment while the litigation is pending. *See Butnaru*, 84 S.W.3d at 211–12; *Davis*, 571 S.W.2d at 862; *Frequent Flyer Depot*, 281 S.W.3d at 228–29 (holding that airline presented evidence of irreparable injury where it was difficult to police appellants' actions and that airline proved damages were not adequate to fully compensate it for its injuries); *Blackthorne*, 61 S.W.3d at 445 (holding that trial court did not abuse its

12

discretion by concluding as a matter of law that the injunction was necessary to maintain the status quo pending a final determination on the merits of the fraudulent transfer claims because the Blackthornes would become judgment proof if they were permitted to transfer stock); *see also ETEN, Inc. v. College of the Mainland*, No. 01-10-00349-CV, 2010 WL 4056859, at *5–6 (Tex. App.—Houston [1st Dist.] Oct. 14, 2010, no pet.) (mem. op.) (holding that trial court did not abuse its discretion by determining that there was some evidence that College of the Mainland established it would suffer a probable injury—the continued diversion and misuse of income and the unauthorized exploitation of its intellectual property by defendants—without the entry of a temporary injunction); *Twyman v. Twyman*, No. 01-08-00904-CV, 2009 WL 2050979, at *5–6 (Tex. App.—Houston [1st Dist.] July 16, 2009, no pet.) (mem. op.) (holding that trial court did not abuse its discretion by granting temporary injunction when the only way to preserve the status quo and prevent further harm to the trust was to deny trustee the ability to withdraw any additional funds from the trust while litigation was pending). We overrule Appellants' second and third issues.

## IV. CONCLUSION

Having overruled all three of Appellants' issues, we affirm the trial court's amended temporary injunction order.

SUE WALKER
JUSTICE

PANEL:  DAUPHINOT, GARDNER, and WALKER, JJ.

DELIVERED:  January 13, 2011