

NUMBER 13-17-00190-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

MIDSTATE ENVIRONMENTAL
SERVICES, LP,                                                    **Appellant,**

**v.**

JOHN ATKINSON AND 5A
ENVIRONMENTAL SERVICES,
LLC,                                                                   **Appellee.**

**On appeal from the 94th District Court
of Nueces County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Contreras and Hinojosa
Memorandum Opinion by Justice Contreras**

This is an appeal of the denial of a temporary injunction. Appellant Midstate

Environmental Services, LP (Midstate) sued its former employee, appellee John Atkinson,

and Atkinson's company, appellee 5A Environmental Services, LLC (5A), claiming that

Atkinson violated a non-compete agreement. By one issue on appeal, Midstate argues that the trial court erred by denying its request for a temporary injunction. We affirm.

## I. BACKGROUND

Midstate provides environmental waste management and related services. Beginning around 1998, Atkinson worked as a route driver for Midstate, collecting used oil, oil filters, antifreeze, and other materials from customers.

On June 1, 2012, Atkinson and Midstate executed an "Employment Signing Incentive and Retention Agreement" (the Retention Agreement). The Retention Agreement stated that, in exchange for Atkinson's continued employment with Midstate and "conditional upon his agreement to and signing of" a "Non-Disclosure, Non-Competition, Non-Solicitation and Limitation Agreement" (the Non-Compete Agreement), Midstate would pay Atkinson a $15,000 signing incentive. The Retention Agreement further provided that Atkinson would be paid a separate $15,000 retention payment if he remained employed by Midstate until June 1, 2014.

Atkinson and Midstate executed the Non-Compete Agreement, as contemplated in the Retention Agreement, on June 5, 2012. The Non-Compete Agreement generally provides that, in consideration for his employment with Midstate, the signing incentive, and Midstate's obligation to provide Atkinson with confidential information and trade secrets, Atkinson agreed that he would not compete with Midstate or solicit its customers during the period of his employment and for one year thereafter. The Non-Compete Agreement defined "trade secret" to include lists of Midstate's customers, suppliers, and prices. The Non-Compete Agreement further contained the following clause: "This Agreement shall constitute the entire understanding between the Parties with respect to

the subject matter hereof and supersedes and replaces all prior communications, understandings and agreements between the parties, whether written or oral, express or implied, relating to the subject matter hereof." Both the Retention Agreement and the Non-Compete Agreement explicitly provided that Atkinson remained an at-will employee of Midstate.

In March 2017, Atkinson's supervisor Robert Staton discovered a business card identifying Atkinson as the owner of 5A and stating that 5A was in the business of "Used Oil/Filters/Antifreeze." Staton also found that Atkinson had applied for a DOT number, which would allow 5A to transport hazardous materials. According to Staton, when he confronted Atkinson with this information, Atkinson did not deny that he was attempting to start a company to compete against Midstate. Staton reported this to Ned Murray, Midstate's president. Believing that this action violated the Non-Compete Agreement, Midstate sued Atkinson and 5A (collectively referred to as Atkinson) for breach of contract, misappropriation of trade secrets under the Texas Uniform Trade Secrets Act, *see* TEX. CIV. PRAC. & REM. CODE ANN. ch. 134A (West, Westlaw through 2017 1st C.S.), and tortious interference with existing contract and prospective business relationships. The trial court then rendered a temporary restraining order which (1) enjoined Atkinson from competing with Midstate in certain Texas counties until April 6, 2017, and (2) and set a temporary injunction hearing for April 3, 2017.

After the hearing, the trial court denied Midstate's request for temporary injunction. Pursuant to Midstate's request, the trial court issued findings of fact and conclusions of law, including the following:

1. Plaintiff failed to prove that it suffered a substantial threat of irreparable injury as a result of conduct by Atkinson.

3

2. Plaintiff could prove any loss it suffered as a result of actions by Atkinson without the necessity of receiving a restraining order.

3. Plaintiff is not entitled a temporary injunction based on the evidence presented at the hearing.

4. Paragraph 10 of the non-disclosure, non-competion [sic], non-solicitation and limitation agreement signed by Atkinson states that it is the only document that defines the rights of the parties and all [sic] replaces all prior agreements between the parties thereby voiding the incentive and retention agreement signed five days prior.

5. Both Agreements make it clear that Atkinson was an at will employee during his tenure with Midstate.

6. Atkinson was privy to all of the company's trade secrets for at least thirteen years before signing either agreement and therefore that could not serve as good and valuable consideration to support the non-compete agreement.

7. The Court finds that sending Atkinson to one training was not sufficient good and valuable consideration to support the non-compete agreement.

This accelerated interlocutory appeal followed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(4) (West, Westlaw through 2017 1st C.S.) (allowing immediate appeal of interlocutory order denying temporary injunction).

## II. DISCUSSION

### A. Standard of Review and Applicable Law

A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (citing *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993)). Its purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Id.* (citing *Walling*, 863 S.W.2d at 57). To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief

4

sought; and (3) a probable, imminent, and irreparable injury in the interim. *Id.* (citing *Walling*, 863 S.W.2d at 57; *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex. 1968)).

Whether to grant or deny a temporary injunction is within the trial court's sound discretion. *Id.* (citing *Walling*, 863 S.W.2d at 58; *State v. Walker*, 679 S.W.2d 484, 485 (Tex. 1984)). We will not overrule the trial court's decision unless it acted unreasonably or in an arbitrary manner, without reference to guiding rules or principles. *Id.* at 211 (citing *Beaumont Bank v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991)). A trial court does not abuse its discretion if some evidence reasonably supports its ruling. *Id.* We review the evidence in the light most favorable to the ruling, drawing all legitimate inferences from the evidence and deferring to the trial court's resolution of conflicting evidence. *Cameron Int'l Corp. v. Guillory*, 445 S.W.3d 840, 845 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

## B.    Temporary Injunction Hearing

At the temporary injunction hearing, Murray testified that Atkinson was the second-highest paid route driver in the company, earning more than $93,000 annually. According to Murray, Atkinson's responsibilities included soliciting new customers for Midstate. Atkinson had daily contact with Midstate's customers, and he had access to its customer lists and pricing methods during his employment. Murray said that, if Atkinson were to compete against Midstate, Midstate would lose business and suffer damage to its reputation, and he opined that the reputation damages would be very difficult to calculate.

On cross-examination, Murray could not name any of Midstate's customers that Atkinson had done business with separately; however, he said his employees had found Atkinson's business cards "in the field at customer locations," so it was "pretty obvious" that Atkinson intended to compete with Midstate. Murray stated that he "assumed"

5

Atkinson's company is ongoing because Atkinson has a business card and a used oil handler's permit, and because the company is registered with the Secretary of State. However, Murray agreed that, in order to compete against Midstate, Atkinson would need a specialized truck to handle used oil collection, and Murray did not know whether Atkinson had such a truck.

Staton testified that he was Atkinson's supervisor for ten years until Atkinson left the company. He stated that Atkinson cultivated relationships with Midstate's customers in twenty-four Texas counties during his time at the company. Since 2012, Atkinson has received weekly confidential customer lists, and Midstate once paid for Atkinson to receive hazardous material training.

Staton testified that, when he approached Atkinson about the 5A business card in March 2017, Atkinson told him that "he had talked to 98 percent of his customers and that they were gonna go with him." Atkinson also showed Staton a picture of a truck which was similar to Midstate's truck. According to Staton, Atkinson said that he was going to go into business for himself and that he did not believe the Non-Compete Agreement was binding. At the end of their meeting, Staton instructed Atkinson to leave his company phone "until we got this situation sorted out" and Atkinson said "there was nothing to sort out." Staton understood this to mean that Atkinson was quitting his job with Midstate. Later, Atkinson returned his Midstate uniforms to the company. Staton said that, although route drivers typically complete a log book every month, Atkinson did not return any log books, and there was only one log book in the truck that Atkinson used.

On cross-examination, Staton conceded that he did not know of any Midstate customers which had stopped doing business with Midstate as a result of Atkinson's

6

competition. He also agreed with Atkinson's counsel that Midstate kept records of which customers Atkinson serviced with Midstate, and it "wouldn't be that hard" to calculate the amount of damages Midstate suffered if any of those customers hired 5A instead. He denied that he intended to fire Atkinson if he did not quit.

John Fabricatore, a Midstate sales representative, testified that he visited between 80 and 100 customers that Atkinson serviced for Midstate, and that some of the customers told him that Atkinson indicated to them he was going to start his own company to compete with Midstate. One of the companies received a 5A business card from Atkinson, which had been stapled to a Midstate receipt; this indicated to Fabricatore that Atkinson had been giving out his business card while still employed by Midstate. Fabricatore identified the names of two customers which he claimed Midstate had lost since March 2017 as a result of Atkinson's competition. On cross-examination, Fabricatore opined that it would, in fact, be "very hard" to calculate damages Midstate suffered as a result of Atkinson's competition.

Atkinson testified that, when he was told to turn in his company phone, he believed he had been terminated from his employment at Midstate. He stated that "when I came to work for Midstate I knew the same things that I know today basically." He knew the names of Midstate's customers, but he denied that he worked with anything that he considered to be a trade secret. Atkinson stated that his company does not currently have a truck capable of oil collection, though he has one "picked out." He admitted handing out his business card to Midstate customers while he was still working with Midstate in an effort to generate business for 5A. He said he threw all of his old log books "in the dumpster."

7

On cross-examination, Atkinson agreed that he signed the Non-Compete Agreement in order to remain employed with Midstate. He also agreed that he signed the Retention Agreement and received the payments contemplated thereunder.

## C.    Analysis

Because it is dispositive, we will first examine whether Midstate established the third temporary injunction element—i.e., a probable, imminent, and irreparable injury in the interim. *See Butnaru*, 84 S.W.3d at 204. Specifically, we focus on the third part of that third element: irreparable injury. *See id.* An injury is considered irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Id.*

On appeal, in discussing the issue of irreparable injury, Midstate relies on Murray's testimony that Midstate's reputation would be damaged by Atkinson's competition. It argues that reputational damages are not easily calculable. *See Tex. Dep't of State Health Servs. v. Holmes*, 294 S.W.3d 328, 334 (Tex. App.—Austin 2009, pet. denied) ("Irreparable harm for purposes of a temporary injunction may include noncompensable injuries such as a 'company's loss of goodwill, clientele, marketing techniques, office stability and the like.'") (citing *Graham v. Mary Kay Inc.*, 25 S.W.3d 749, 753 (Tex. App.—Houston [14th Dist.] 2000, pet. denied)); *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. denied) (same). In response, Atkinson contends that, based on the evidence adduced at the temporary injunction hearing, the trial court could have reasonably concluded that monetary damages would adequately compensate Midstate if it prevails at trial.

8

We agree with Atkinson. In its application for temporary injunction contained within its petition, Midstate did not argue that it would suffer reputational damage or loss of goodwill as a result of Atkinson's competition.[1] At the temporary injunction hearing, Murray testified that Atkinson's competition may harm Midstate "reputation wise," but when pressed by his counsel to elaborate, Murray could not clearly explain how Midstate's reputation would be damaged.[2] Moreover, although Fabricatore testified that it would be difficult to calculate Midstate's damages resulting from the loss of clientele to 5A, both Murray and Staton explicitly agreed that it would not be difficult. Staton agreed that, to determine Midstate's damages from Atkinson's competition, it was necessary only

---

[1] Regarding irreparable injury, Midstate alleged in its petition only as follows:

Plaintiff has no adequate remedy at law because the economic value of Midstate's trade secrets and confidential information is difficult to precisely ascertain, and once the confidential information and trade secrets are disclosed to third parties not subject to confidentiality agreements, they will likely be impossible to recover, resulting in irreparable injury to Midstate. In any event, although irreparable harm to Midstate is imminent here, a showing of irreparable harm is not necessary under the Covenants Not to Compete Act.

Midstate did not make these specific arguments at the temporary injunction hearing, and it does not make them on appeal.

[2] Murray testified as follows regarding the nature of Midstate's damages:

| | |
|---|---|
| Q. [Midstate's counsel]: | [H]ow would Midstate be damaged if Mr. Atkinson is allowed to compete in violation of [the Non-Compete Agreement]? |
| A. [Murray] | On various levels. The first level, of course, would be lost volume of business, that's a pretty obvious one. But also, reputation wise, a change in the market dynamics and the economics of our business, you know, the efficiency of our routes is very directly related to how productive, in particular, geography is. And if we were to lose a part of that, a portion of that, or all of it, obviously, it's economically not—it doesn't help the efficiency of our business. It's a little harder to get into numbers, but they're certainly there. |
| Q. | Okay. So that sounds like more of a direct damage. You had mentioned reputational damage. Tell me about that a little bit. |
| A. | Well, Mr. Atkinson was with the company for 19 years and we had some expectation of we were all on the same side, we were all playing for Midstate Environmental Services. And then, not too long ago we find that that's not the case, that he was preparing to compete against us without us, frankly, behind our back. |

9

to calculate the proceeds that Midstate would have received for each customer that switched to 5A.

Because some evidence supports the trial court's finding that Midstate's injury is not irreparable by the award of damages, the trial court did not abuse its discretion by denying the temporary injunction. *See Butnaru*, 84 S.W.3d at 204.[3] We overrule Midstate's sole issue on appeal.

### III. CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Justice

Delivered and filed the
14th day of December, 2017.

---

[3] We emphasize that we express no opinion on the ultimate enforceability of the agreements at issue, or whether they were breached.